Brinkema (A)

FILED
MAILROOM

FEB - 2 2010

CLERK U.S. ... CT COURT
... GINIA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

RANDALL TODD ROYER,                    )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )   Civil No. _l)o cV146 lmb\IDD_
                                       )
FEDERAL BUREAU OF PRISONS and          )
UNKNOWN FEDERAL AGENCY,                )
                                       )
          Defendants.                  )

RECEIVED

FEB - 4 2010

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

## COMPLAINT

## Introduction

1.     Plaintiff is a federal inmate in the custody of the Federal
Bureau of Prisons ("BOP"). For years after entering the federal prison
system, Plaintiff enjoyed the rights and privileges of ordinary inmates
with respect to housing in the general population, communication with his
family, access to religious, educational, and employment opportunities,
etc.

2.     The BOP has since classified Plaintiff as a "terrorist inmate,"
imposing harsh, atypical restrictions on his conditions of confinement
relative to those of ordinary prisoners, including limitations on telephone
use; a total ban on physical contact with his family, including his two
elderly parents, his now-estranged wife, and his four young children; total
sequestration from the general prison population and the facilities it
accesses; limitations on group prayer and a total ban on group religious
study; and severe limitations on his educational and employment
opportunities. Plaintiff's classification, and the attendant harsh
conditions of confinement, are of an indefinite duration, and are intended
to remain in place until the end of his prison term.

3.   The BOP's classification of Plaintiff as a "terrorist inmate," and the attendant harsh, atypical conditions of confinement, are based in substantial part on records maintained by the BOP which it knows to be inaccurate. Rather than seeking such information directly from Plaintiff, the BOP collected this information from an unknown federal agency, which itself knew the records to be inaccurate, and which failed to seek Plaintiff's consent before disclosing those records to the BOP. Moreover, the BOP refuses to amend its inaccurate records, and it refuses to provide Plaintiff with access to those records and other documents. The two agencies committed these actions, or failed to act, willfully, and in flagrant violation of Plaintiff's rights.

4.   As a result of the BOP's determination to classify him or treat him as a "terrorist inmate" and impose upon him harsh, atypical conditions of confinement in substantial part on the basis of inaccurate records, Plaintiff has suffered the violation of his constitutional rights, the loss of his family's society, emotional trauma with accompanying physical symptoms, financial loss, and damage to his reputation. In light of the foregoing, the BOP and the unknown federal agency have therefore violated the Privacy Act of 1974, 5 U.S.C. § 552a, et seq., the Freedom of Information Act, 5 U.S.C. § 552, et seq., and the First and Fifth Amendments to the U.S. Constitution. Appropriate relief is requested.

**Jurisdiction and Venue**

5.   The Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction), 5 U.S.C § 552 (Freedom of Information Act), and 5 U.S.C. § 552a (Privacy Act).

6.   Venue in this Court is proper under 28 U.S.C. 1391(e) and 5 U.S.C. § 552a(g)(5) because Plaintiff is resident and domiciled in the

Eastern District of Virginia at 6166 Leesburg Pike in Falls Church.

**Parties**

7.   Plaintiff Randall Todd Royer, also known as Ismail Royer, is a United States citizen and federal prisoner currently incarcerated at the Federal Correctional Institution in Greenville, Illinois ("FCI Greenville"). He is 36 years old.

8.   Defendant BOP is a federal agency under the Privacy Act and is headquartered at 320 First Street, NW, Washington, DC 20534. BOP classifies prisoners to determine where and under what conditions they are to be housed, and creates and operates prisons in which prisoners are confined.

9.   Defendant Unknown Federal Agency is a federal agency under the Privacy Act. This agency or a component of this agency has direct or indirect access to the information in Pre-Sentence Investigation Reports ("PSRs") prepared by the United States Probation Office ("USPO"). Upon information and belief, this agency or office is a component of the United States Department of Justice ("DOJ"). The identity of this agency will be specified in an amended complaint following discovery.

**Previous Lawsuits**

10.   Plaintiff was a party to Royer, et al. v. Jett, et al., No. 2:09-cv-0011 (S.D. Ind.), which was filed in January 2009. Plaintiff voluntarily withdrew on advice of counsel and the case was dismissed as to him without prejudice. The case continues sub nom. Benkahla v. Federal Bureau of Prisons with a severed coplaintiff.

11.   Plaintiff is currently a plaintiff in Arnaout, et al. v. Warden, No. 2:09-cv-215 (S.D. Ind.), in which he is represented by the ACLU.

**Exhaustion of Administrative Remedies**

12.  Plaintiff has exhausted his available administrative remedies using the BOP's Administrative Remedy Program.

**Facts Giving Rise to the Claims for Relief**

**I.   Background**

13.  On January 16, 2004, Plaintiff pleaded guilty in the Eastern District of Virginia before Judge Leonie M. Brinkema to one count of aiding and abetting the use and discharge of a firearm during and in relation to a conspiracy to violate the Neutrality Act, and one count of aiding and abetting the carrying of an explosive during a conspiracy to violate the Neutrality Act.

14.  On February 27, 2004, preparatory to Plaintiff's sentencing hearing, the USPO completed a draft PSR and then provided the draft to the judge, Plaintiff's attorney, and the attorney for the United States.

15.  The draft PSR contained, inter alia, information drawn from the Statement of Facts Plaintiff had signed pursuant to his plea agreement, including his affirmation that, during the 1992-1995 war in Bosnia and Herzegovina, he had fought on the side of the Bosnians against the Serbian army as part of the "Abu Zubair" unit. This fact had no direct bearing on the offenses for which Plaintiff was indicted or convicted.

16.  The Abu Zubair unit with which Plaintiff was affiliated was a detachment of the 737th Brigade of the 7th Corps of the Army of the Republic of Bosnia and Herzegovina and was dissolved at the end of the war. This unit was never designated as a terrorist organization by the government of the United States or any other government.

17.  The last sentence of ¶ 42 of the draft PSR stated as follows:

4

Abu Zubair (known more formally as Abu Zubair al Madani) was a member of Al Qaeda sent to Bosnia by Bin Laden to establish camps for Al Qaeda.

18. This sentence was false; moreover, it was not part of the Statement of Facts signed by Plaintiff. The source of the error was a confusion between the Abu Zubair unit with which Plaintiff was affiliated, and an individual with a similar name who had died years before Plaintiff was in Bosnia and who had no connection whatsoever with Plaintiff's unit.

19. Plaintiff's sentencing hearing was held on April 9, 2004. At the hearing, his defense attorney orally objected to the inaccurate last sentence of ¶ 42 of the draft PSR. The stated basis for that objection was that provided in ¶ 18, supra.

20. In response to the objection by Plaintiff's attorney, the AUSA acknowledged the inaccuracy of the sentence in question and did not oppose the objection.

21. Following the above exchange, Judge Brinkema ordered that the last sentence of ¶ 42 of the draft PSR be deleted. In response to other objections by Plaintiff's attorney, the judge also ordered the deletion of ¶¶ 39, 40, and 41 from the draft PSR.

22. Accordingly, the USPO deleted ¶¶ 39, 40, 41, and the last sentence of ¶ 42 from the PSR. The deleted material did not appear in the final version of the PSR (the "final adopted version"), which was completed by the USPO on April 19, 2004.

23. Per its ordinary procedures, the USPO transmitted the final adopted version of the PSR to the BOP for the agency's use in classifying Plaintiff.

24. The USPO has never provided the draft PSR to the BOP, or to anyone other than Plaintiff's attorneys, the sentencing court, and the attorney

for the United States. Neither Plaintiff, his attorneys, the USPO, nor the sentencing court have ever provided the draft PSR to the BOP.

25. The final adopted version of the PSR, redacted by the Court, is maintained by the BOP in Plaintiff's "Central File," i.e., in the BOP's Inmate Central Records System. The file is under the control of a correctional counselor assigned to Plaintiff at the institution in which he is confined. Plaintiff makes no allegation in this Complaint that the final adopted version of his PSR in his Central File is inaccurate.

26. In her Judgement and Committal Order, Judge Brinkema recommended to the BOP that Plaintiff be confined in Federal Correctional Institution Allenwood ("FCI Allenwood"), a medium-security prison located in Pennsylvania, relatively close to his Northern Virginia home.

27. From about August 2004 to December 2006, per the Court's recommendation, Plaintiff was confined in FCI Allenwood. Plaintiff was housed in the general population and his conditions of confinement were typical relative to those of ordinary inmates and prison life.

28. On April 3, 2006, the BOP published in the Federal Register a proposed regulation titled "Limited Communication for Terrorist Inmates." The regulation would have instituted a regime of severe restrictions on the conditions of confinement of inmates who, under the new policy, the BOP would classify as "terrorist inmates." The proposed regulation included limits on those inmates' telephone use, visitation, and use of the mail.

29. The BOP's proposed regulation drew strong objections from a wide range of civil liberties organizations. Subsequently, the BOP abandoned the required notice and comment procedure as to the proposed regulation, and it was never promulgated in the Code of Federal Regulations. Instead,

the BOP quietly put into practice policies and procedures substantially similar to the proposed regulation, classifying certain prisoners as "terrorist inmates" and imposing tight restrictions on their ability to communicate and other conditions of their confinement.

## II. Records Violations and Agency Intent

30. The records violations committed by the Defendants in this case consist of the failure to maintain accurate records, failure to collect information directly from the subject individual, unauthorized disclosure of information, failure to amend records, and failure to provide access to records.

31. Plaintiff first became aware of the maintenance, collection, and disclosure of the records at issue by way of a February 5, 2009 response to a request form he submitted to BOP staff. The dates of the remaining records violations are discussed _infra_ in the appropriate sections.

### A.   Failure to Maintain Accurate Records

#### 1.   Inaccurate Records in a Non-Exempt System of Records

32. Between April 2004 and the present date, the BOP has continuously maintained the inaccurate information that the Court had ordered deleted from the final adopted version of Plaintiff's PSR. These records comprise the contents of the draft PSR, records containing the material deleted from the PSR, or records derived or based on the deleted material.

33. The inaccurate records maintained by the BOP contain, _inter alia_, the following statement, which is a verbatim passage from the redacted last sentence of ¶ 42 of the draft PSR:

> Abu Zubair (known more formally as Abu Zubair al Madani) was a member of Al Qaeda sent to Bosnia by Bin Ladin to establish camps for Al Qaeda.

34. Between April 2004 and the present date, the BOP has continuously

maintained until the present date records derived from what the agency describes as "open source reporting," containing information suggesting that Plaintiff has been affiliated with Al Qaeda, a group designated by the United States as a Foreign Terrorist Organization. These records are likewise inaccurate.

35. The inaccurate records maintained by the BOP at issue in this case are identifiable, retrievable, and actually retrieved by Plaintiff's name.

36. The inaccurate records are maintained in a system of records maintained by the BOP's Counter Terrorism Unit ("CTU") or the Intelligence Section. The record system containing the inaccurate records is separate and distinct from the Inmate Central Records System, i.e., Plaintiff's Central File, and has not been exempted by the BOP from the Privacy Act pursuant to 5 U.S.C. § 552a(j) and listed at 28 C.F.R. § 16.97.

### 2. Willfulness

37. In maintaining the inaccurate records, the BOP knows, or should know, that its actions are unlawful; in doing so, it is flagrantly disregarding Plaintiff's rights under the Privacy Act.

38. The BOP has willfully maintained the records comprising the material deleted from Plaintiff's PSR and derived from that material, knowing that the United States has stipulated that material to be false, that it was deleted by the Court, and that by maintaining those records it was contravening a court order.

39. The BOP has willfully maintained the records comprising the material deleted by the Court, despite the agency's possession of the final adopted version of the PSR which it received from the USPO through

legitimate, authorized channels, and knowing that this was the only version of the PSR it was authorized to maintain. The BOP knew, moreover, that the USPO would not consent to its maintenance of these records had it known about it, indicative of which is that, in August 2009, an employee of the BOP with knowledge of the inaccurate records intentionally led an officer of the USPO to believe that the BOP did not possess, and had never possessed, these records.

40.  Likewise, the BOP has willfully maintained the records derived from "open source reporting" suggesting that Plaintiff has been affiliated with Al Qaeda, despite the agency's knowledge that there is no basis in fact for such an assertion.

41.  Indicative of the fact that the BOP has willfully maintained the inaccurate records at issue in this case is that it has failed to make any attempt to remedy the harm that has resulted to Plaintiff or amend those records, despite Plaintiff's efforts from February 2009 to the present to persuade the BOP to do so. Rather, its position is characterized by obfuscation and intransigence, as in this response Plaintiff received from a BOP staff member to a written request he submitted:

> You have pursued this issue for some time now from BOP staff and USPO staff; you have received responses previously; which have been adequately addressed to your inquiries. This issue is repetitive and needs no further response.

## B.  Failure to Collect Information Directly from Plaintiff

### 1.  Collection of Information

42.  The BOP has never attempted to collect directly from Plaintiff the information contained in the records at issue in this case. Instead, the BOP chose to circumvent Plaintiff and collect the information concerning him from the Unknown Federal Agency and "open source reporting."

43. The BOP knew when it collected the information contained in the records at issue in this case that had it instead chosen to first elicit the information directly from Plaintiff, he could have done nothing to destroy, alter, or conceal that information. Moreover, the BOP knew when it collected this information that no obstacles or legitimate considerations existed that would have militated against first eliciting that information directly from Plaintiff.

### 2. Willfulness

44. In failing to collect the information contained in the records at issue in this case directly from Plaintiff, the BOP knew, or should have known, that its actions were unlawful; in doing so, the agency flagrantly disregarded Plaintiff's rights under the Privacy Act. In support of this assertion, Plaintiff restates and incorporates by reference herein ¶¶ 38-39 and 42-43, supra.

### C. Unauthorized Disclosure of Records

### 1. Records in a System of Records

45. The Unknown Federal Agency did not seek Plaintiff's consent prior to disclosing the records about him to the BOP.

46. Upon information and belief, the records concerning Plaintiff disclosed by the Unknown Federal Agency were identifiable, retrievable, and actually retrieved by Plaintiff's name, and were contained in a system of records. The basis for this assertion is that the records at issue are inherently identifiable by Plaintiff's name, and because records in criminal cases are typically maintained by this federal agency in a system of records.

### 2. Non-Exempt Disclosure

47. None of the Privacy Act's enumerated exceptions to the

prohibition of unauthorized disclosure apply in this case.

48. The BOP had no legitimate need in performing its duties for the records disclosed to it by the Unknown Federal Agency.

49. The BOP was not authorized by law to perform any activity with these records, inasmuch as the information contained therein had been deleted by court order.

50. Upon information and belief, the director of the BOP did not make a written request for these records to the Unknown Federal Agency as required by the Privacy Act. The basis for this assertion is the remoteness of the possiblity that the director of the BOP would make a formal written request in conformity with the law for a record, the possession of which would contravene a court order.

### 3. Willfulness

51. In disclosing the records to the BOP without Plaintiff's consent, the Unknown Federal Agency knew, or should have known, that its actions were unlawful; in doing so, the agency flagrantly disregarded Plaintiff's rights under the Privacy Act.

52. When it disclosed the records to the BOP without Plaintiff's consent, the Unknown Federal Agency well knew that the United States had stipulated the information to be false, and that by disclosing the records it was contravening a court order. The agency knew, moreover, that such records were generally confidential court documents unlawful to disclose to a third party.

53. When it disclosed the records to the BOP without Plaintiff's consent, the Unknown Federal Agency well knew that the BOP had already received or would receive, through legitimate, authorized channels, a copy of the final adopted version of Plaintiff's PSR from the USPO, and that

this was the only version of the PSR the BOP was authorized to receive, and the only version it needed to perform its duties. Moreover, the Unknown Federal Agency knew that the USPO would not have consented to its disclosure had it been aware of it.

### D.   Failure to Amend Records

#### 1.   First Record Amendment Request

54.   On June 22, 2009, Plaintiff submitted a letter via U.S. mail to the BOP's FOIA/PA Section asking that the agency amend, pursuant to the Privacy Act, the inaccurate records containing the information deleted from the PSR and the information collected from "open source reporting." The amendment request specified the records system in which the records were maintained and noted that the record system was not the Inmate Central Record System or any properly exempted record system.

#### 2.   Second Record Amendment Request

55.   On July 20, 2009, Plaintiff submitted a second letter via U.S. mail to the BOP's FOIA/PA Section asking that the agency amend, pursuant to the Privacy Act, all records derived from the material deleted by the Court from the PSR, including any records referencing Plaintiff's alleged association with a so-called "Bosnian terrorist group." The import of this second amendment request, Plaintiff explained therein, was to encompass all records derived from the records that were the subject of the June 22, 2009 amendment request. Like the first request, the July 20, 2009 request specified the non-exempt record system in which the subject records were maintained.

56.   Plaintiff received a letter dated August 19, 2009, from Wanda M. Hunt, Chief of the BOP's FOIA/PA Section. The letter asserted that Plaintiff was not permitted to request amendment of records located in the Inmate

12

Central Records System. The letter was a generic form letter and contained no reference to the specific subject records of the two requests or to which of the amendment requests the letter was in response to. Nor did the letter address Plaintiff's specification that he sought amendment of records not located in the Inmate Central Records System.

57. Although the BOP failed to review his two amendment requests in conformity with the Privacy Act, Plaintiff elected to administratively appeal Ms. Hunt's letter with an August 25, 2009 letter to the DOJ's Office of Information Policy. The stated grounds of the appeal were that, in his two amendment requests, Plaintiff had specified that the records he sought amendment of were not located in the Inmate Central Records System or any other exempt records system.

58. The August 25, 2009 appeal letter further noted that Plaintiff had submitted two separate amendment requests, and that the letter from Ms. Hunt had failed to identify which of the two requests had been addressed. So, in an abundence of caution, Plaintiff wrote in his appeal letter that he deemed it an appeal from the denial of both amendment requests, but that if he were to receive a subsequent letter specifically denying the July 20, 2009 request, he would appeal that denial separately.

59. Plaintiff received a letter dated September 14, 2009, from the Office of Information Policy stating that his appeal had been forwarded to a different office for processing. The letter gave no date as to when a response to the appeal could be expected.

60. Plaintiff has received no further letters to date concerning his two amendment requests or his appeal.

**E.    Failure to Provide Access to Records**

**1.    First Access Request**

61.  On June 2, 2009, Plaintiff submitted a letter via U.S. mail to the BOP's FOIA/PA Section requesting, pursuant to the Privacy Act and the Freedom of Information Act, access to, <u>inter alia</u>,

> a copy of the record derived from "open source reporting" referenced by the [BOP] Central Office employee in the February 5, 2009 response to my inmate request to staff, along with any associated documents relevant to this record...

Plaintiff requested other records in the letter but that portion of the request is not at issue here.

62.  Plaintiff received a letter dated July 8, 2009, from Ms. Hunt of the BOP's FOIA/PA Section. The letter made reference to the Freedom of Information Act but no reference whatsoever to the Privacy Act. As to the relevant records, Ms. Hunt stated that "no records were located responsive" to the request.

63.  On July 20, 2009, Plaintiff submitted a letter via U.S. mail to the DOJ's Office of Information Policy. Although the BOP had failed to process his request under the Privacy Act, he designated his letter as an appeal under FOIA as well as the Privacy Act. As pertains to the records at issue, Plaintiff appealed on the grounds that

> [t]he BOP knows precisely which of its employees utilized the "open source reporting" record, yet it claims it cannot find that record. The BOP merely needs to inquire of the employee whose name it redacted as to where this record is located, and it will be able to produce said record in response to my request. Clearly the agency's search was inadequate.

64.  Plaintiff received a letter dated September 25, 2009, from the Office of Information Policy. In relevant part, the office wrote that it had "determined that BOP conducted an adequate, reasonable search for

records responsive to your request." The letter informed Plaintiff of his
right to sue under FOIA.

### 2. Second Access Request

65. On July 20, 2009, Plaintiff submitted a letter via U.S. mail to
the BOP's FOIA/PA Section requesting, pursuant to the Privacy Act and the
Freedom of Information Act, access to

> all records maintained on me by the Counter Terrorism Unit ("CTU")
> section of the BOP, to include records maintained by the CTU in that
> section's Washington, DC location, as well as its Martinsburg, West
> Virginia [location].

66. In that letter, Plaintiff also requested access to all documents
generated by the CTU and the BOP's Correctional Programs Division concerning
the decision to place him in the Communications Management Unit, to include
records concerning his transfer to that unit.

67. In that letter, Plaintiff emphasized that he was not seeking
records maintained solely in his Central File, i.e., the Inmate Central
Records System.

68. Plaintiff received a letter dated August 13, 2009, from the BOP's
North Central Regional Office. The letter stated that the agency was
extending the time limit for processing his request by 10 days and that it
would respond to the request no later than August 24, 2009.

69. Plaintiff received a letter dated September 30, 2009, from Ms.
Hunt of the BOP's FOIA/PA Section. In the letter, Ms. Hunt stated that
Plaintiff's records request would be processed only as a FOIA request, not
as a Privacy Act request, because

> [t]he information you seek is being maintained in a Privacy Act system
> of records that has been exempted from the access provision of the
> Privacy Act by the Director of this agency...Thus you have no right of
> access to this information under the Privacy Act.

Ms. Hunt did not state the name of the supposedly exempt records system.

70. As to the records maintained on Plaintiff by the CTU, Ms. Hunt stated that nine folders of records had been located, that one page of one folder could be released, and that the remaining eight folders were being withheld in their entirety.

71. As to these withheld records, the reasons Ms. Hunt gave for her determination were that one of the nine folders held by the CTU constituted Plaintiff's PSR, and that BOP regulations prohibit inmates from possessing their PSRs; therefore, said Ms. Hunt, Plaintiff would have to contact his correctional counselor to review the PSR in his Central File. As to the remaining folders, Ms. Hunt stated that they were being withheld under the following FOIA exemptions: (b)(2), (b)(5), (b)(7)(C), (b)(7)(E), and (b)(7)(F). Ms. Hunt did not specify which exceptions allegedly applied to which records in which folders.

72. As to Plaintiff's request for access to all documents generated by the CTU and the Correctional Programs Division concerning his placement and transfer to the CMU, Ms. Hunt stated that two pages were found and that both could be released.

73. In November 2009, Plaintiff submitted a letter via U.S. mail to DOJ's Office of Information Policy. Although the BOP had failed to process his request under the Privacy Act, Plaintiff designated his letter as an appeal under FOIA as well as the Privacy Act. As to the decision concerning the records held on him by the CTU, Plaintiff stated the following grounds for his appeal: (1) the request should have been processed under the Privacy Act because the CTU's record system is not exempt from that act; (2) the cited FOIA exemptions were not applicable; (3) the BOP should not have withheld every record in its entirety, but should have only redacted the relevant data; (4) the copy of the PSR maintained in the CTU's system of

records is a different version of his PSR than the copy held by his correctional counselor in the Inmate Central Records System, and it is the former he wished to review, not the latter; (5) the BOP should have stated the nature of the withheld records and how many were in each folder.

74. As to the records concerning his placement in the CMU, Plaintiff challenged the adequacy of the BOP's search. He noted that a similar FOIA/PA request by a fellow inmate of the Communications Management Unit had resulted in a detailed memorandum from the CTU Chief concerning the reasons for that inmate's transfer. It was this sort of document that Plaintiff sought, he wrote.

75. Plaintiff received a letter from the Office of Information Policy dated December 4, 2009, acknowledging receipt of his appeal and notifying him that the response would be delayed.

76. Plaintiff has received no further letters to date concerning this records request.

**III. Adverse Determination and Effect**

77. Except for brief periods of administrative or disciplinary segregation, Plaintiff was a member of the general inmate population from the time of his arrest in June 2003 until December 2006, both in the county jails he was confined in and at FCI Allenwood.

78. As a member of the general population at FCI Allenwood, Plaintiff was subject to the ordinary conditions of prison life.

79. As an ordinary inmate in the general population, Plaintiff had the run of the prison and access to its facilities, a condition that allowed him the semblance of an ordinary life. He was able to run outdoors on a lengthy track breathing fresh air. He had the opportunity to enroll in a vocational training course and earn a carpentry license, or take academic

courses for college credit. He was on the waiting list to work in the prison factory, where inmates earned up to $100 a month.

80. As an ordinary inmate in the general population, Plaintiff enjoyed up to forty hours of full contact visits a month with his wife, two elderly parents, and four young children. With the close physical contact and the substantial time afforded, Plaintiff and his wife were able to maintain their marriage relationship. He could hug her, provide her with comfort and advice, and participate in household decisions. Plaintiff was able to remain a father figure for his children, bouncing them on his knee, playing games with them, offering guidance, and mediating squabbles. He and his parents were able to draw closer than they had ever been through hours of quality time spent discussing the important things of life over coffee.

81. Sometime after his arrival at FCI Allenwood in about August 2004 and prior to December 2006, pursuant to the policies and procedures it quietly adopted after the failure of its proposed regulation, see ¶¶ 28-29, supra, the BOP classified Plaintiff as a "terrorist inmate" and determined that, for the remainder of his prison sentence, he would be subject to harsh restrictions on his ability to communicate and other conditions of his confinement.

A. Proximate Cause

82. The BOP's decision to classify Plaintiff as a "terrorist inmate" and to impose harsh, indefinite restrictions on his conditions of confinement, was based in substantial part, though not wholly, on the inaccurate records that the BOP maintained and failed to collect directly from Plaintiff, and that the Unkown Federal Agency disclosed without Plaintiff's consent.

83. Per its policies and procedures, the inaccurate records at issue

in this case are sufficient to have triggered the BOP's determination to classify Plaintiff as a "terrorist inmate," even had those records been the sole existing basis for that determination.

84.  Whether the BOP's technical term for its classification of Plaintiff is "terrorist inmate," or some other term or label or euphemism, or even a de facto classification without a specific label, the effect is the same, and the agency's determination was in any event based in substantial part on the inaccurate records at issue in this case.

### B.  Adversity

85.  The adverse effects which Plaintiff has suffered as a consequence of the actions of the BOP and the Unknown Federal Agency include the violation of his constitutional rights to due process and freedom of speech and association, loss of consortium, emotional trauma with physical symptoms, loss of income, and damage to his reputation.

### 1.  Due Process

86.  The adverse effects suffered by Plaintiff as a consequence of the BOP's determination to classify him, de facto or otherwise, as a "terrorist inmate," do not inhere solely in the place of incarceration, but in the classification itself. In other words, the classification means that the atypical conditions of confinement are applied to Plaintiff regardless of which prison or housing unit he is confined in.

87.  However, due to the practical requirements of maintaining the atypical restrictions that accompany the "terrorist inmate" classification, the BOP generally houses such prisoners only in the harshest, most restrictive prisons and housing units in the federal prison system, namely: the "supermax" prison in Florence, Colorado ("ADX Florence"); the Communications Management Unit ("CMU") at Federal Correctional Institution

Terre Haute ("FCI Terre Haute") or the CMU at the federal prison in Marion,
Illinois; the Special Management Unit ("SMU") at USP Lewisburg, a unit
actually intended for use as a gang management program; or under
heightened restrictions in a Special Housing Unit ("SHU") at a prison
where an inmate is on "holdover" status, that is, pending transfer to one
of the aforementioned locations. Hence, it is the classification itself
that determines the "terrorist inmate's" conditions of confinement, not
the particular prison or housing unit in which the BOP confines him.
Regardless of his housing unit, these conditions of confinement are meant
to endure indefinitely.

88. In December 2006, without warning, Plaintiff was taken from his
cell in FCI Allenwood and placed in the SHU. He was given an "Administrative
Detention Order" signed by a lieutenant stating the reason for his SHU
placement as "pending Classification." That was Plaintiff's last day in the
general population.

89. Days later, BOP officers in black suits, helmets, body armor, and
tactical gear escorted Plaintiff to a waiting van guarded by similarly-
outfitted men with automatic weapons. This is not the BOP's ordinary
procedure for prisoner transfers.

90. Plaintiff was driven to USP Lewisburg for holdover, where he
joined 15 other men -- 13 of them Muslims, all alleged by the BOP to have
terrorism connections -- who had arrived from prisons across the United
States. The group were held in isolation cells in the SHU.

91. The next day, Plaintiff and the other 15 men were transported to
the former death row at FCI Terre Haute. They were the first inmates to be
confined in what the BOP had christened the Communications Management Unit.
Plaintiff was confined in this unit from December 2006 to October 2009.

92. As of September 2009, of the more than 60 current or former Terre Haute CMU inmates, all but four were alleged by the BOP to have connections to political or religious extremism or terrorism. More than 40 have been Muslims.

93. In accord with the BOP's procedures for "terrorist inmates," the CMU is completely sealed off from the rest of FCI Terre Haute, and CMU inmates are not permitted to have any contact with the general inmate population, or to use the facilities and resources that other inmates have access to.

94. While the CMU inmates are allowed out of their cells, they are not permitted to leave the tight quarters of the housing unit. Steel slats obscure the view from the windows. Recreation takes place in steel cages, far from FCI Terre Haute's large, well-equipped recreation yard and lengthy track. CMU inmates have no access to the prison chapel, and unlike inmates in the general population, they are permitted to pray in congregation only on Friday. They are not permitted to study religious topics together, even one-on-one.

95. CMU inmates have no access to college credit courses, as Plaintiff had at FCI Allenwood, and as federal regulations require. There are no prison factory jobs, as federal regulations also require, and no opportunity for vocational training like in the general population.

96. At the CMU, Plaintiff was permitted to make only one 15 minute telephone call a week, compared to the 300 minutes of telephone time that the general population inmates receive. For three years he was permitted to make telephone calls only on business days between 8:30 am and 2:30 pm, with the result that months went by when Plaintiff could not speak with his school-age children. Inmates in the general population can make phone calls

at nights and on weekends.

97. In contrast to the visits Plaintiff enjoyed as an ordinary inmate
in the general population, see ¶ 81, supra, at the CMU he was permitted
visits only behind glass and bars, communicating through a telephone. Visits
were restricted to just two hours, just twice a month. In violation of
federal regulations, visits were permitted on business days only, see 28
C.F.R. 540.42(c), and only during business hours. The practical effect of
this was to render family visits a rare, logistically difficult hardship.

98. The BOP's Central Office has described the CMU as a "control
unit." Title 28 C.F.R. § 541.40(c) states that control units are "intended
to place into a separate unit those inmates who are unable to function in a
less restrictive environment without being a threat to others or to the
orderly operation of the institution."

99. The BOP has indicated that the CMUs are operated under BOP Program
Statement 5270.07, a set of policies issued by the agency pursuant to 28
C.F.R. §§ 541.10-.23, titled "Inmate Discipline and Special Housing Units."

100. In October 2009 at the Terre Haute CMU, Plaintiff received an
incident report for involvement in an altercation. To separate him from the
other inmates involved, he was transferred to FCI Greenville pending his
transfer to another facility. He was placed in the SHU.

101. As a consequence of his "terrorist inmate" classification, the
BOP instructed FCI Greenville staff to impose, to the greatest extent
possible, precisely the same restrictions on Plaintiff's communications and
other conditions of confinement that were imposed on him at the CMU. For
example, Plaintiff is isolated to a greater extent than is typical for the
SHU. He is not allowed to exercise in the recreation cages at the same time
as other SHU inmates, and staff have placed sandbags in front of his cell

door. Also unlike other SHU inmates, the BOP has instructed FCI Greenville
staff that Plaintiff is not permitted to have contact visits.

102. Initially upon his arrival at FCI Greenville, staff told Plaintiff
that he would either eventually be sent back to the Terre Haute CMU, or be
transferred to the Marion CMU. In December 2009, Plaintiff was informed that
the BOP intends to transfer him to ADX Florence. He was then given a
psychological evaluation preparatory to that transfer, which has yet to be
approved or finalized.

103. The reason that the BOP intends to transfer Plaintiff to ADX
Florence is not because his disciplinary violation was particularly severe;
rather, the reason is that the "terrorist inmate" classification the BOP has
imposed on Plaintiff limits the agency as to where it can house him. If the
transfer to ADX takes place, Plaintiff will be housed in the area of the
prison reserved for "terrorist inmates," not with the inmates sent to ADX
for disciplinary reasons. If the transfer to ADX does not take place, the
BOP's procedures for "terrorist inmates" dictate that Plaintiff will be
sent to a CMU, the SMU gang program at USP Lewisburg, or kept indefinitely
in the SHU at FCI Greenville. In any event, the BOP intends to permanently
maintain the same harsh, atypical conditions of confinement.

104. Hence, any hearings or other apparent procedural protections a
"terrorist inmate" might be afforded regarding housing in ADX Florence or
the SMU at USP Lewisburg are illusory and meaningless. This is because
if an inmate is released from, or avoids transfer to, one of these units,
he is merely going out of the frying pan and into the fire, as it were. The
BOP keeps substantially similar conditions of confinement in place regardless
of where such inmates are confined.

105. Federal regulations and BOP policies establish procedures that purport to protect inmates from the arbitrary imposition of harsh, atypical conditions of confinement like those the BOP has permanently imposed on Plaintiff. These protections include: (1) hearings held prior to or shortly after the imposition of those conditions; (2) notice to the inmate of criteria for release from those conditions; and (3) notice of the projected date of the inmate's release from those conditions. Plaintiff has never received any of these protections as to his classification as a "terrorist inmate" or the attendant conditions of confinement.

106. There is no regulatory or statutory framework or basis providing for the BOP to declare inmates to be "terrorists," permanently impose upon them the harshest conditions of confinement in the federal prison system, disqualify them from any procedural protections as to those conditions, and, for the remainder of their prison sentence, shuttle them around an archipelago of SHUs, SMUs, CMUs, and the federal supermax prison.

## 2.   Freedom of Speech and Association

107. Forcing Plaintiff to "visit" with his family separated from them by a concrete wall, peering through a window of glass and bars, and audible only through a telephone, impinges on his ability to communicate and associate with them. He cannot communicate through touch: through a kiss on his daughter's cheek or by pressing his mother's hand. He cannot conduct group conversations with multiple visitors due to the limitation of the single telephone handset. And he cannot surmount the psychological and emotional barrier to communication erected by the physical barrier between him and his visiting family.

108. The sole reason the BOP gives for disallowing Plaintiff's contact visits is that his offense conduct -- in which the BOP prominently includes

the inaccurate information concerning him in its records -- necessitates monitoring of his communication.

109. There is no rational rational relationship between the goal of monitoring Plaintiff's communications and a total, permanent ban on physical contact with his family. Even if it is somehow rationally related, it is an exaggerated response to that concern.

110. The BOP has never claimed that Plaintiff committed any actions during his contact visits that posed a threat to the security of the institution or the public. The BOP has never claimed, and has no evidence to suggest, that Plaintiff has misused his visits to communicate anything of a dangerous or illicit nature.

111. In the CMU and in all of its facilities, the BOP has installed multiple cameras and hypersensitive microphones. And its officers thoroughly and expertly strip search all inmates both before and after contact visits. After exhausting his administrative remedies on this issue, and after tens of conversations with BOP staff and officials -- including the then-director of the Correctional Programs Division -- the BOP has never been able to explain why such measures would not meet its need of monitoring Plaintiff's communication.

### 3. Loss of Consortium

112. Incarceration does not, in itself, necessarily result in the disintegration of a prisoner's relationship with his family. On the contrary, the maintenance of such relationships is regarded as being of great penological value. Telephone calls and contact visits are two of the main avenues that the BOP provides for inmates to maintain their family relationships.

113. As previously noted, BOP inmates in the general population are afforded 300 minutes of telephone time a month, and they may call at nights and on weekends. In this way, they can speak for hours every month with their family members, even if they work or go to school.

114. Also as noted, BOP inmates in the general population have contact visits with their families for over 40 hours a month. The BOP permits contact visits for the general population because of their superiority over non-contact visits in strengthening inmates' relationships with their families. Families may visit on weekends and federal holidays and some weekdays, making possible the lengthy weekend or holiday roadtrips often necessary -- as in Plaintiff's case -- for travel to remote federal prisons.

115. In December 2006, when the BOP classified Plaintiff as a "terrorist inmate" and shipped him about 800 miles from his family, imposed a total and permanent ban on all physical contact with them, and sharply curtailed the amount of his calls and visits and the days and times they were permitted, the agency delivered a shattering blow to his relationship with his wife and children.

116. The Defendants' actions have irrevocably damaged Plaintiff's marital relationship. The dissolution of his marriage began with the loss of the hugs, kisses, and hand-holding the couple enjoyed at FCI Allenwood. The physical barrier between Plaintiff and his wife at their non-contact visits at the Terre Haute CMU laid the foundation for an emotional barrier. The great physical distance between the prison and their home in Northern Virginia became an emotional distance. His wife's visits became rarer as her desire for brief, non-contact, emotionally unsatisfying visits with her husband waned. "If we had contact visits I could stay with him," she

confided to a friend. She sought and obtained a religious divorce. They have not seen each other in over a year.

117. The Defendants' actions have likewise damaged Plaintiff's parental relationship with his children. Because they usually visit with their mother, Plaintiff has not seen the two youngest in over a year. Even when the children do visit, seeing their father behind glass and bars is a troubling, alienating experience for them. Because communication is through a telephone, Plaintiff can only speak with one child at a time, making normal family conversation impossible. Because he is forbidden to hold them, kiss them, or play with them, their rare visits do little to renew the weakening bond between them. And on top of all this, because of the BOP's rule that Plaintiff cannot use the telephone after 2:30 pm, over the past three years, months have gone by when he has not spoken to his children because they are in school at the time.

### 4.    Emotional Trauma

118. Plaintiff's family is the most important thing to him in this world, the axis around which his worldly existence revolves. The void left by the loss of his wife, the impotence he feels in seeing his children grow up without his guidance, influence, and love -- not even to the limited extent possible under typical conditions of confinement -- have afflicted him with severe bouts of grief, anxiety, and stress. The physical manifestations of this are detailed in the next section.

### 5.    Damaged Reputation

119. Upon information and belief, information contained in or derived from the inaccurate records at issue in this case is accessible to BOP officers and staff, and has been even before the BOP imposed the atypical

conditions of confinement on him in December 2006.

120. Examples of manifestations of the damage to Plaintiff's
reputation include the following: In 2006 a BOP officer at Harrisburg
International Airport in Harrisburg, Pennsylvania told Plaintiff: "I read
your paperwork and I don't like it." In the same year, a guard at USP
Lewisburg held a mirror up to Plaintiff's face while he was shackled and
told him he would forcibly shave off his religious beard, and that he
would put Plaintiff in a cell with gang members who "owed him a favor"
and would beat him up. A guard at the Oklahoma City prisoner transfer
center called Plaintiff "his little terrorist" and held pictures up to
his cell window which he claimed he'd printed off the Internet supposedly
depicting Muslim men in positions of prayer being sodomized. Guards at
FCI Allenwood "stripping out" Plaintiff prior to his transportation on
writ told Plaintiff in a menacing fashion to close the door of the small
laundry room they were in. When Plaintiff asked why they wanted the door
closed for him but not for the inmates who had gone before him, one
replied, "We read your paperwork. We might have to fight you."

## IV.  Actual Damages

121. As a consequence  of Defendants' actions and failures to act,
Plaintiff has suffered actual damages, including the violation of his
constitutional rights, loss of consortium, emotional trauma, damaged
reputation, and loss of income.

### A.  Constitutional Violations

122. Plaintiff has been injured by the deprivation of his right to
due process under the Fifth Amendment and his right to freedom of speech
and association under the First Amendment. In support of this allegation,
Plaintiff restates and incorporates herein ¶¶ 86-111, supra.

### B.   Loss of Consortium

123. Because of Defendants' actions, Plaintiff has lost his wife's society, companionship, fellowship, and conjugal affection. He no longer makes decisions concerning his household; he no longer has a household. Plaintiff has lost the comfort of his wife, her attention, and her love. Defendants' actions have deprived Plaintiff of his pillar of support.

124. Because of Defendants' actions, Plaintiff has lost his ability to guide and care for his children. He can no longer comfort them or be comforted by them. He cannot offer them solace and advice as they endure the challenges of growing into adolescence. Plaintiff and his children cannot share affection, attention, and love. Defendants have inflicted serious damage on the parental bond between these children and their father.

### C.   Emotional Trauma

125. Because of Defendants' actions in causing the loss to Plaintiff of his family's society, he has suffered emotional trauma with physical manifestations. He has experienced bouts of debilitating grief resulting in changes in his behavior and a negative impact on his conduct and lifestyle. The severity of these emotions ebbs and flows, so that for periods of weeks or months his anguish saps his motivation, confining him to his bed and causing him to withdraw from social interaction and to abandon his reading and his exercise. Plaintiff's desire for sleep and difficulty doing so leads him to rely on allergy medication for sleep during the worst of these periods.

126. As the years have passed without his family, Plaintiff's manner and attitude have become characterized by bitterness and cynicism, to the extent that BOP staff and other inmates have noticed the change in his personality. "You've changed since you first got here," one officer at

FCI Terre Haute frequently remarked during Plaintiff's last months at the unit. "If you're miserable, don't make everyone around you miserable, too," he once advised. Also, Plaintiff often experiences spontaneous tears when he sees children on television. His grief has dulled his appetite and rendered eating a tedious chore.

127. Plaintiff suffers from stress and anxiety as a result of the loss of his family connections, and has sought and received counseling and literature from prison psychologists. He suffers from headaches, a racing heart, and tightness of chest during the worst of his periods of grief and anguish. Plaintiff sought treatment for his racing heart.

**D. Damaged Reputation**

128. Defendants' circulation of the false claim that Plaintiff trained and fought with an Al Qaeda associate is per se defamatory. Moreover, it has resulted in threats to Plaintiff, abuse, and embarassment.

**E. Financial Loss**

129. Inmates in the general population have the opportunity to work in prison factories that comprise the Federal Prison Industries, also known as UNICOR. Indeed, federal regulations require that these jobs be available to such inmates.

130. As previously noted, at FCI Allenwood, inmates could make up to $100 a month working at UNICOR, and Plaintiff was on the waiting list to work there as well. In that way, Plaintiff could have earned money for commissary purchases, telephone calls, or even to buy gifts or pay bills for his family. But as a "terrorist inmate," Plaintiff is housed under conditions that provide him no opportunity to work in a prison factory.

**Claims for Relief**

131. The allegations contained in ¶¶ 1-130, supra, are restated and

incorporated by reference within each of the following claims for relief.

I.  **Count One: Failure to Maintain Accurate Records -- 5 U.S.C. § 552a ₩e)(5) & (g)(1)(C)**

132. Between April 2004 and the present, Defendant BOP, through its officers, employees, or agents, has intentionally and willfully maintained inaccurate records pertaining to Plaintiff in a non-exempt system of records, to wit, records comprising the contents of Plaintiff's draft PSR or records derived from said contents, which records were a substantial cause of a BOP determination adverse to Plaintiff, from which he suffered actual damages.

II. **Count Two: Failure to Maintain Accurate Records -- 5 U.S.C. § 552a ₩e)(5) & (g)(1)(C)**

133. Between April 2004 and the present, Defendant BOP, through its officers, employees, or agents, has intentionally and willfully maintained inaccurate records, to wit, records containing or derived from "open source reporting" suggesting that Plaintiff has been associated with Al Qaeda, which records were a substantial cause of a BOP determination adverse to Plaintiff, from which he suffered actual damages.

III. **Count Three: Failure to Collect Information Directly From Subject Individual -- 5 U.S.C. § 552a₩e)(2) & (g)(1)(D)**

134. Between April 2004 and December 2006, Defendant BOP, through its officers, employees, or agents, intentionally and willfully failed to elicit information directly from Plaintiff to the greatest extent practicable, to wit, the contents of Plaintiff's draft PSR; and Defendant has maintained such information, both itself and in a derivative form, in records maintained in a non-exempt system of records, which records were a substantial cause to him of adverse effects from which he suffered actual

damages.

## IV. Count Four: Failure to Collect Information Directly from Subject Individual -- 5 U.S.C. § 552a(e)(2) & (g)(1)(D)

135. Between April 2004 and December 2006, Defendant BOP, through its officers, employees, or agents, intentionally and willfully failed to elicit information directly from Plaintiff to the greatest extent practicable, to wit, "open source reporting" suggesting that Plaintiff has been associated with Al Qaeda; and Defendant has maintained such information, both itself and in derivative form, in records maintained in a non-exempt system of records, which records were a substantial cause to him of adverse effects from which he suffered actual damages.

## V. Count Five: Unauthorized Disclosure of Records -- 5 U.S.C. § 552a(b) & (g)(1)(D)

136. Between April 2004 and December 2006, Defendant Unknown Federal Agency, through its officers, employees, or agents, intentionally and willfully disseminated to an unauthorized agency, without Plaintiff's consent, the content of records relating to Plaintiff that are maintained by Defendant Unknown Federal Agency in a system of records, to wit, the contents of Plaintiff's draft PSR, which records were a substantial cause to him of adverse effects from which he suffered actual damages.

## VI. Count Six: Failure to Amend Records -- 5 U.S.C. § 552a(g)(1)(A)

137. Despite Plaintiff's properly filed June 22, 2009 request for amendment of records pertaining to him maintained by Defendant BOP in a non-exempt system of records, to wit, the records comprising the contents of the draft PSR and the records derived from "open source reporting" suggesting that Plaintiff has been associated with Al Qaeda, the BOP has made a determination under subsection (d)(3) of the Privacy Act not to amend those records, or it has failed to review the amendment request in

conformity with that subsection.

138. With his August 25, 2009 letter of appeal from the BOP's denial
of his amendment request or failure to review his request, Plaintiff has
exhausted the administrative remedy process as to this claim.

**VII. Count Seven: Failure to Amend Records -- 5 U.S.C. § 552a(g)(1)(A)**

139. Despite Plaintiff's properly filed July 20, 2009 request for
amendment of records pertaining to him maintained by Defendant BOP in a
non-exempt system of records, to wit, the records derived from the
contents of the draft PSR, including any reference to a so-called "Bosnian
terrorist group," the BOP has made a determination under subsection (d)(3)
of the Privacy Act not to amend those records, or it has failed to review
the amendment request in conformity with that subsection.

140. With his August 25, 2009 letter of appeal from the BOP's denial
of his amendment request, Plaintiff has exhausted the administrative
remedy process as to this claim.

**VIII. Count Eight: Failure to Provide Access to Records -- 5 U.S.C. §§
552(a)(4)(B) & 552a(g)(1)(B)**

141. Despite Plaintiff's properly filed June 2, 2009 request under
FOIA and the Privacy Act for access to records maintained by Defendant BOP
in a non-exempt system of records, to wit, the records derived from "open
source reporting" suggesting that Plaintiff has been associated with Al
Qaeda, the BOP failed to review that request in conformity with the Privacy
Act.

142. The BOP failed to make a good faith effort to conduct a search
for the records sought in the June 2, 2009 request using methods which
could reasonably be expected to produce the information requested.

143. With his July 20, 2009 letter of appeal from the BOP's denial of

his records access request, and the DOJ's September 25, 2009 determination
upholding the relevant portion of that denial, Plaintiff has exhausted the
administrative remedy process as to this claim.

IX.  **Count Nine: Failure to Provide Access to Reords — 5 U.S.C. §§
     552(a)(4)(B) & 552a(g)(1)(B)**

144. Despite Plaintiff's properly filed July 20, 2009 request under
FOIA and the Privacy Act for access to records maintained by Defendant BOP
in a non-exempt system of records, to wit, all records maintained by the
agency's Counter Terrorism Unit pertaining to Plaintiff, as well as all
records maintained by the CTU and the Correctional Programs Division
concerning the decision to designate and transfer him to the Communications
Management Unit, the BOP failed to review that request in conformity with
the Privacy Act.

145. The BOP's determination to withhold all of the aforementioned
records, to wit, the nine folders maintained on Plaintiff by the CTU, on
the basis of various FOIA exemptions, was unjustified.

146. The BOP failed to make a good faith effort to conduct a search
for the other records sought in Plaintiff's July 20, 2009 request, to wit,
the records maintained by the Correctional Programs Division or CTU
concerning the decision to designate and transfer him to the CMU.

147. With his November 2009 letter of appeal from the denial of his
records access request, Plaintiff has exhausted the administrative remedy
process as to this claim.

X.  **Count Ten: Violation of Due Process — Fifth Amendment to the U.S.
    Constitution**

148. From December 2006 and continuing to the present, Defendant BOP
has failed to afford Plaintiff due process with respect to its
classification of him as a "terrorist inmate" and its concomitant

imposition upon him of harsh, atypical conditions of confinement for the duration of his prison sentence.

149. This claim is brought directly under the U.S. Constitution pursuant to <u>Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971).

150. Defendant BOP is not immune to this claim because with it, Plaintiff seeks only injunctive relief.

## XI. Count Eleven: Violation of Freedom of Speech and Association — First Amendment to the United States Constitution

151. From December 2006 and continuing until the present, Defendant BOP's total, permanent prohibition on physical contact with his visiting family has violated Plaintiff's right to freedom of speech and association and parental and family rights, inasmuch as this prohibition does not bear a rational relationship to a legitimate government interest, or it is an exaggerated response to such an interest.

152. This claim is brought directly under the U.S. Constitution pursuant to <u>Bivens</u>.

153. Defendant BOP is not immune to this claim because with it, Plaintiff seeks only injunctive relief.

## Prayer for Relief

WHEREFORE, Plaintiff respectfully requests that the Court:

    a.   Accept jurisdiction of this case and set it for a hearing;

    b.   Award money damages in Plaintiff's favor for the harm caused by Defendants' failure to maintain accurate records, failure to collect information directly from Plaintiff, and unauthorized disclosure of records;

    c.   Award equitable relief in Plaintiff's favor due to the harm

caused by Defendants' records violations;

d.  Order Defendant BOP to amend its inaccurate records;

e.  Order Defendant BOP to give Plaintiff access to the subject records and to undertake a reasonable, sufficient search for the relevant records;

f.  Declare that Defendant BOP is violating Plaintiff's right to due process;

g.  Declare that Defendant BOP is violating Plaintiff's freedom of speech and association and his family rights;

h.  Enter a preliminary injunction, later to be made permanent, enjoining Defendant BOP to lift the harsh, atypical conditions of confinement that it has permanently imposed upon him;

i.  Enter a preliminary injunction, later to be made permanent, enjoining Defendant BOP to permit Plaintiff to have contact visits with his family;

j.  Award Plaintiff his costs and expenses;

k.  Grant such other and further relief as this Court deems just and proper.


Dated this 19th day of January, 2010.

Respectfully submitted,

RANDALL TODD ROYER
Reg. No. 46812-083
Federal Correctional Institution
P.O. Box 5000
Greenville, IL  62246