**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

<table>
<tr><td>

**RANDALL TODD ROYER**

      **Plaintiff,**

v.

**FEDERAL BUREAU OF PRISONS**

      **Defendant.**

</td><td>

)
)
)
)
)
)
)
)
)
)
)

</td><td>

**Civil No. 10-1996 (RCL)**

</td></tr>
</table>

<u>**MEMORANDUM OPINION**</u>

     This case concerns the Federal Bureau of Prison's ("BOP") classification of federal prisoner Randall Todd Royer (aka Ismail Royer) as a "terrorist inmate."  Specifically, Royer alleges that BOP has violated the federal Privacy Act by maintaining and refusing to correct records that allegedly inaccurately link him with Al Qaeda and that BOP's classification of him as a "terrorist inmate" and imposition of attendant harsh conditions of confinement has violated his Procedural Due Process and First Amendment rights.

     Defendant Federal Bureau of Prisons ("BOP") has moved for summary judgment as to the Privacy Act claims and has moved to dismiss Royer's Constitutional claims for lack of jurisdiction, or alternatively, failure to state a claim.  ECF No. 91.

     Upon consideration of BOP's Motion, the plaintiff's Opposition [98] thereto, and the entire record in this case,[1] the Court will: (1) DENY WITHOUT PREJUDICE BOP's Motion for Summary Judgment regarding Royer's Privacy Act claims; (2) DENY BOP's motion to dismiss for lack of jurisdiction; (3) GRANT BOP's motion to dismiss Royer's First Amendment claims

---

[1] BOP did not file a Reply in support of its motion.

for failure to state a claim; and (4) DENY BOP's motion to dismiss Royer's Due Process claims. The Court also DISMISSES Royer's Freedom of Information Act (FOIA) claims because he states that he will no longer press them.  *See* Pl.'s Mem. Supp. of Opp'n to Def.'s Mot. Dismiss or for Summ. J. 23–24, ECF No. 98-1 [hereinafter Pl.'s Opp'n].

The Court does not decide the legality of BOP's practice of classifying prisoners as "terrorist inmates" or whether Royer should or should not be deemed a "terrorist inmate."  A related case in this Court considers whether BOP violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq., by failing to engage in notice-and-comment rulemaking before implementing its "terrorist inmate" classification program.  *See* Am. Compl., *Royer v. Fed. Bureau of Prisons*, No. 10-cv-1196 (D.D.C. Sept. 9, 2011).

I.     **BACKGROUND**

A.     **Offense Conduct and Conviction**

Royer is a United States citizen born in Missouri.  In 2004, he and ten other men were charged in the U.S. District Court for the Eastern District of Virginia with numerous offenses including conspiracy to levy war against the United States in violation of 18 U.S.C. § 2384, conspiracy to provide military support to Al Qaeda, in violation of 18 U.S.C. § 2339B, and conspiracy to contribute services to the Taliban in violation of 50 U.S.C. § 1705.  Ultimately, Royer pleaded guilty to two counts:  Aiding and Abetting the Use and Discharge of a Firearm During and in Relation to a Crime of Violence (Felony) in violation of 18 U.S.C. §§ 2 and 924(c)(2), and Aiding and Abetting the Carrying of an Explosive During the Commission of a Felony in violation of 18 U.S.C. §§ 2 and 811(h)(2).  According to Royer, the relevant felony was violation of the Neutrality Act, which makes it a crime to "knowingly begin[] . . . or provide[] or prepare[] a means for . . . any military or naval expedition . . . against the territory or

dominion of any foreign prince or state . . . with whom the United States is at peace." 18 U.S.C. § 960.  The specific acts supporting Royer's convictions included his efforts in the summer of 2000 and fall of 2001 to assist several co-conspirators in gaining access to training camps in Pakistan run by Lashkar-e-Taiba[2] ("LET"), a group designated as a foreign terrorist organization ("FTO") in December 2001.   While at those camps, his co-conspirators fired semi-automatic pistols and carried a rocket-propelled grenade.   Royer was sentenced on April 9, 2004 to two consecutive ten-year terms with credit for time served.

Of relevance to this case, Royer converted to Islam in 1992 and shortly thereafter traveled to Bosnia for six months to fight on behalf of the Bosnians in the 1992–1995 war in Bosnia and Herzegovina.  Compl. ¶ 15.  While there, Royer trained and fought as part of the "Abu Zubair" unit against the Serbian army.  *Id.*  Although Abu Zubair was never designated a terrorist organization by the United States, BOP now suggests that it is or has been affiliated with a terrorist organization.  Def.'s Stmt. Mat. Facts ¶ 6, ECF No. 91 [hereinafter Def.'s SMF].

### B.      Present Controversy

As of today, Royer has served approximately nine and a half years of his 20-year sentence.  For the first three and a half years of his incarceration, Royer was housed in the general prison population.  Compl. ¶ 77.  However, since December 2006, when Royer was classified as a "terrorist inmate," he has been housed in various locations isolated from the general population, including the Special Housing Units ("SHUs") at FCI Allenwood and USP Lewisburg, the Communications Management Unit ("CMU") at FCI Terre Haute; the SHU at FCI Greenville; the supermax facility at Florence, Colorado ADX; and currently the CMU at USP Marion.  Compl. ¶¶ 77, 88–91, 100; Def.'s SMF ¶¶ 1–2; ECF No. 14; ECF No. 104.

---

[2] Spelled in various documents as Laskar-e-Tabia or Lashkar-e Tayyib, LET is the military arm of a group founded to organize mujahideen in violent jihad against the Russians in Afghanistan. PSR ¶¶ 22, 42, 93. LET's primary focus after the Russians left Afghanistan was jihad against the Government of India to oust it from Kashmir. PSR ¶ 22, 93.

While in the general population, Royer asserts that he had "run of the prison and access to its facilities." Compl. ¶ 79.  He could run outdoors on a track, enroll in vocational training and earn a carpentry license, take classes for college credit, and work in the prison factory for pay.  *Id.*  He enjoyed up to forty hours of full contact visits per month with his family, Compl. ¶ 80, and appears to have had 300 minutes of telephone time per week, Compl. ¶ 96.

In December 2006, he asserts that BOP determined that certain restrictions would apply to his confinement for the remainder of his prison term (or about 16.5 years as of that date).  According to Royer, the conditions imposed as a result of his "terrorist inmate" classification require that he be housed "in the harshest conditions of confinement in the federal prison system."  Compl. ¶ 106.  Specifically, from December 2006 to October 2009, Royer was housed in the CMU at FCI Terre Haute.  Compl. ¶ 91.  There, although he was allowed out of his cell, he was not permitted to leave the "tight quarters" of the housing unit and was not permitted to have any contact with the general inmate population.  Compl. ¶ 93–94.  Royer could only exercise in "steel cages" and was denied access to college credit courses, jobs, or vocational training.  Compl. ¶ 95.  Additionally, Royer had no access to the prison chapel, was permitted group religious services only on Fridays, and was not permitted to study religious topics one-on-one with other inmates in the CMU.  Compl. ¶ 94.  He was permitted only one 15-minute phone call per week, and only on business days between 8:30am and 2:30pm.  Compl. ¶ 96.  Finally, he was allowed only two visits per month and these were limited to two-hours each and were required to be noncontact, meaning that he must speak with visitors through a telephone, separated by a concrete and glass wall.  Compl. ¶ 97.  When Royer was transferred to the SHU at FCI Greenville after an altercation, the prison imposed the same conditions, even when those were harsher than those for other SHU inmates.  Compl. ¶ 101.  After the filing of this complaint,

Royer was transferred to the supermax facility at ADX Florence in or around March 2012, ECF No. 14, and then to the CMU at USP Marion in or around November 2012, ECF No. 104.

Based on his conditions of confinement and his allegation that BOP has relied on inaccurate information to determine his "terrorist inmate" status, Royer now lodges both statutory and Constitutional claims against BOP under the federal Privacy Act, the Fifth Amendment Due Process clause and the First Amendment.[3]

Royer seeks money damages and equitable relief for the alleged violations of the Privacy Act. With respect to the alleged constitutional violations, he seeks a declaration that BOP is violating his rights to due process, freedom of speech, and freedom of association, and an order that BOP lift the conditions and allow contact visits with his family. Finally, he seeks costs and expenses.[4] Compl. 36.

This is the third dispositive motion filed by BOP in this litigation. Royer initially filed his claim in the Eastern District of Virginia and, in lieu of an Answer, BOP filed a Motion to Dismiss or for Summary Judgment. ECF No. 23. Specifically, BOP sought summary judgment on the Privacy Act claims and moved to dismiss the constitutional claims for lack of subject matter jurisdiction and failure to state a claim. That motion was fully briefed; however, after requesting additional briefing from the parties, the court *sua sponte* held that venue was improper in the Eastern District of Virginia and transferred the case to this Court. ECF No. 60. BOP filed an Answer here, ECF No. 65, and subsequently filed a second Motion to Dismiss or,

---

[3] As already mentioned, the Court now dismisses Royer's FOIA claims. Certain additional claims have been previously dismissed by the Court. *See* ECF Nos. 46, 54, 63.

[4] Similar litigation challenging the constitutionality of these conditions of confinement and the BOP's failure to engage in notice-and-comment rulemaking has been filed by other prisoners classified as terrorist inmates, including at least one case pending in this District. *See Aref v. Holder*, 774 F. Supp. 2d 147 (D.D.C. 2011) (holding that plaintiffs had plausibly alleged a procedural due process claim but dismissing the plaintiffs' claim that defendants violated their First Amendment right to "family integrity" and dismissing plaintiffs' APA claims as moot because BOP had resumed the rulemaking process in 2010).

in the Alternative for Transfer to the U.S. District Court for the District of Colorado. ECF No. 68. Rather than raising the defenses of lack of subject matter jurisdiction or failure to state a claim—and despite the fact that BOP had previously acknowledged that venue was proper here, Def.'s Resp. to Court's Order of Sept. 28, 2010, ECF No. 57—BOP argued that Royer's claims should be treated as a disguised habeas claim and that venue was proper in Colorado where he was then incarcerated. The Court disagreed and denied without prejudice the Motion to Dismiss or in the Alternative for Transfer. Mem. & Order, Mar. 29, 2012, ECF No. 83.

BOP now again seeks summary judgment on Royer's Privacy Act claims (Counts 1, 2, 4, and 6–8) and renews its arguments (omitted from the last dispositive motion) that Royer's Constitutional claims (Counts 9–10) should be dismissed for lack of subject matter jurisdiction or failure to state a claim.[5]

## II.   ANALYSIS

### A.   Motion for Summary Judgment Regarding Privacy Act Claims

#### 1.   Legal Standard

Summary judgment should be granted when "the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphasis added); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A fact is material if it could affect the outcome of the case.  *Id.*  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

---

[5] Because the motion to dismiss was filed after BOP filed its answer, it is technically one for judgment on the pleadings. *See* Fed. R. Civ. P. 12(c).  However, the standards for awarding judgment under a Rule 12(b)(6) motion to dismiss and Rule 12(c) motion for judgment on the pleadings are "virtually identical."  *See Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987), *abrogated on other grounds by Hartman v. Moore*, 547 U.S. 250 (2006); *see also* Wright and Miller, Federal Practice and Procedure, § 1367 (noting that if the defenses of failure to state a claim or lack of subject matter jurisdiction are raised in a Rule 12(c) motion, "presumably the district court will apply the same standards . . . as it would have . . . under Rules 12(b)(1) [or] (6) . . . .").  Thus, the Court will apply the standard for a motion to dismiss here.

The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  The non-movant, however, must establish more than "the existence of a scintilla of evidence" in support of his position, *id.* at 252, and may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

### 2.        Privacy Act Generally

The Privacy Act requires federal agencies maintaining "systems of records" to allow individuals to review and request copies of and amendments to records pertaining to them.  5 U.S.C. § 552a(d).  The Act also imposes requirements regarding the accuracy and source of information agencies maintain.

"Systems of records" under the Privacy Act are those under the control of the agency from which "information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.* § 552a(a)(5).  In response to requests for amendment, agencies must either allow an individual to make corrections or inform the individual of the reason for the agency's refusal to amend and procedures for seeking review of the refusal. *Id.* § 551a(d)(2).  Agencies must also, "to the greatest extent practicable," collect information "directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs." *Id.* § 551a(e)(2).  Finally, agencies must "maintain all records which are used by the agency in making any determination about any individual with such accuracy . . . as is reasonably necessary to assure fairness to the individual in the determination." *Id.* § 552a(e)(5).

Judicial review is available when an agency refuses to provide access, copies, or amendments, or fails to maintain accurate records or otherwise comply with the law "in such a

way as to have an adverse effect on an individual." *Id.* § 552a(g)(1). Courts may enjoin the agency from withholding records and order production and amendment of records. *Id.* §§ 552a(g)(2)(A)–(B), 552a(g)(3)(A)–(B). They may assess reasonable attorney fees and costs against the United States. *Id.* Actual damages are available in suits for failure to maintain accurate records or failure to comply with other provisions of the law if the agency acted intentionally or willfully. *Id.* § 552a(g)(4)(A)–(B).

Causes of action under the Privacy Act may be brought in the District Court for the District of Columbia within two years from the date on which the cause of action arises. *Id.* § 552a(g)(5).

The head of an agency with the principal function of enforcing criminal laws, including correctional agencies, may exempt systems of records from Privacy Act provisions, including those provisions related to access, copying, amendment, and maintenance of accuracy of records. *Id.* § 552a(j). Federal regulations currently exempt BOP's Inmate Central Record System (ICRS) from certain Privacy Act provisions, specifically those related to access to and amendment of records, *id.* § 552a(d), collection of information directly from individuals, *id.* § 552a(e)(2), civil remedies, *id.* § 552(g), and accuracy, *id.* § 552a(e)(5). *See* 28 CFR § 16.97. Inmates may instead contest the accuracy and content of records administratively. 28 CFR §§ 16.9, 16.45; Letter from Wanda M. Hunt, Chief, FOIA/PA Section, Federal Bureau of Prisons, to Randall Royer, Aug. 19, 2009, ECF No. 91-1 at 31.

### 3. Summary Judgment Is Premature

Royer alleges that BOP knowingly maintained inaccurate records about him, Compl. ¶¶ 132–33 (describing Counts 1–2); that BOP has intentionally and willfully failed to elicit information directly from him, Compl. ¶ 135 (describing Count 4); that it refuses to amend the

inaccurate records, Compl. ¶¶ 137–40 (describing Counts 6–7); and that it refuses to provide him with access to these records, Compl. ¶¶ 141–47 (describing Counts 8–9).  Royer seeks money damages and an order that BOP give him access to the relevant records and amend inaccurate records.  Compl. 35–36.

Royer's Privacy Act claims relate primarily to his assertion that BOP continues to erroneously characterize Abu Zubair, the Bosnian group with whom he fought in 1994, as a terrorist organization with ties to Al Qaeda.  Royer's complaint initially alleged that BOP obtained this erroneous information from a draft version of his PSR.  That draft stated that Royer had trained and fought with "Abu Zubar," PSR ¶ 42, and that "Abu Zubair (known more formally as Abu Zubair al Madani) was a member of Al Qaeda sent to Bosnia by Bin Laden to establish camps for Al Qaeda."  Compl. ¶ 33; Draft PSR ¶ 42.  At his sentencing hearing, Royer objected to the latter statement and argued that it confused the Bosnian Abu Zubair military group with an individual Al Qaeda member with a similar name who had died several years before Royer's affiliation with the group.  Compl. ¶¶ 15–22; Mem. Op. 3, ECF No. 59.  The government acknowledged the error and the court ordered that the line be stricken from the final PSR.  *Id.*

Royer does not contest the accuracy of his final PSR, which is contained in his "Central File" in BOP's Inmate Central Records System.  Compl. ¶ 25.  However, Royer asserts that BOP somehow obtained access to the erroneous information that had been deleted from the draft PSR.[6]  Whatever the source of the information, Royer argues that it remains inaccurate, that BOP used it to classify him as a terrorist inmate, Compl. ¶¶ 32–41, that BOP has maintained similar inaccurate records they obtained from "open source reporting," *id.* ¶ 39, and that BOP has failed

---

[6] There is much back and forth in the record about whether BOP had the *actual* draft PSR.  However, Royer does not now assert that BOP has the actual document but that BOP somehow obtained the deleted material, perhaps from an Addendum to the draft PSR which included Royer's objection to the statement.

to provide him access to the records, to collect information directly from him, or to respond to his requests that the records by amended.  Compl. ¶¶ 42–44, 54–76.

BOP argues that it is "not in possession of the draft PSR as alleged by Plaintiff, nor has the Bureau ever had possession of the draft PSR . . . [or] used information from a draft PSR in the classification of Plaintiff."  Def.'s SMF ¶ 4 (citing Schiavone Decl. ¶ 6).  BOP does not explain why, in a letter to Royer, it used language that mirrored the deleted draft PSR language verbatim.  *See* Pl.'s Opp'n, Ex. 11, ECF No. 98-2 at 23 (including a statement that mirrors the draft PSR verbatim that "Abu Zubair (known more formally as Abu Zubair al Madani) was a member of Al Qaeda sent to Bosnia by Bin Laden to establish camps for Al Qaeda").

BOP states that the "[final] PSR includes self-admissions by the Plaintiff to training and fighting with a group in Bosnia known as 'Abu Zubair, II' a group also known as Abu Zubair al Madani, which according to publicly available information, is associated with Al Qaeda, and identified as a FTO."  Def.'s SMF ¶ 6.  BOP goes on to list some of the "publicly available records" used to research Abu Zubair.

There are several problems with BOP's assertion.  First, in the PSR, Royer only admitted to training with a group known as "Abu Zubar"; the remainder of BOP's statement appears to be based on its own research.  *See* PSR ¶ 42, ECF No. 100.  Second, it does not appear that Abu Zubair is now or has ever been listed as an FTO by the United States.  *See* Foreign Terrorist Organizations, U.S. Dep't of State (Sept. 28, 2012), http://www.state.gov/j/ct/rls/other/des/123085.htm.  Third, the public records listed by BOP in support have already been called into question by Judge Brinkema of the Eastern District of Virginia and BOP has not provided this Court with any explanation for why the records are of any value.  Although Judge Brinkema transferred the case to this Court for lack of venue, her

Opinion is worth quoting at length both because she was the sentencing judge in Royer's original case and because BOP made substantially the same arguments before her that it now makes before this court.  Judge Brinkema noted:

> Royer raises some very serious allegations in his Complaint.  In fact, in light of arguments advanced by BOP itself, it appears that BOP may in fact be maintaining inaccurate information about Royer, in violation of this Court's oral order during Royer's sentencing hearing that Paragraph 42 of his Pre-Sentence Report be stricken as erroneous.  Specifically, in its Motion to Dismiss or for Summary Judgment, BOP continues to make reference to the fact that Royer fought with a Bosnian military unit known as "Abu Zubair," and improperly confuses that group with a now deceased al Qaeda operative by that same name. . . . [T]he BOP . . . allege[s] that the Abu Zubair group with which plaintiff trained and fought in Bosnia "is associated with al Qaeda," and that "publicly available records" . . . confirm that fact.  In particular BOP cites four web sites which it claims contain publicly available records tying the Bosnian Abu Zubair group to terrorism. . . .  [T]he link to www.historycommons.org [is] broken and no longer connect[s] to [a] valid web site[].  Other [links], such as the links to a copy of an indictment returned by a grand jury in the Northern District of Illinois and a press release issued by the U.S. Attorney's Office in that same case, replicate the same confusion between the *group* Al Zubair and the *individual* by the same name that gave rise to Royer's original objection to his draft PSR.  Thus, whether the information regarding Abu Zubair was derived from the Addendum to Royer's PSR or from open source reporting, BOP appears to be perpetuating the exact same error that the government already admitted to making during Royer's sentencing hearing.  The government's demonstrated inability to learn from its own mistakes - mistakes to which it stipulated in a public hearing before this Court - is a matter of serious concern.

*Royer v. Fed. Bureau of Prisons*, No. 10-cv-0146, 2010 WL 4827727, at *2–3 (E.D. Va. Nov. 19, 2010).

For unknown reasons, the government continues to advance the same argument and put forth the same public sources (including a broken link) in support of its argument, despite having previously acknowledged to a federal court that the information is inaccurate. [7]  If the

---

[7] These sources continue to include, mysteriously, the home page of the Department of Justice, www.justice.gov. The Court is unsure how citation to the Department's homepage provides any support for the contention that Abu Zubair is a terrorist organization with links to Al Qaeda.  A search of the Department's website produced no additional information other than the indictment and press release already provided by the government.

government has new, reliable information suggesting that the *group* Abu Zubair had ties to terrorist organizations, such as Al Qaeda, it should provide the Court with that information.[8]

Despite the evidence that the government may be maintaining inaccurate information linking Royer to Al Qaeda, the government argues that judicial review and the protections of the Privacy Act are unavailable.

Specifically, BOP argues that the PSR, as a court document, is not within the purview of the Privacy Act, "notwithstanding its use or retention by agencies such as BOP." Def.'s Mem. 2. This argument lacks merit. First, since BOP does not even acknowledge that it has the draft PSR, its potential status as a "court document" is irrelevant. Second, Royer does not assert that BOP has the actual draft PSR but that it somehow obtained the inaccurate information that had originally been included in, *and later stricken from*, the draft document. The issue is not the source of the information, but whether the information BOP continues to use and rely on is inaccurate.

BOP also argues that its ICRS system of records has been exempted from the civil remedy and damages provisions of the Privacy Act and that BOP has no duty to amend allegedly inaccurate records. Def.'s Mem. 15. BOP thus implicitly suggests that the records at issue are housed in the ICRS, though it never states this explicitly. However, Royer does not dispute that the ICRS is exempt from the Privacy Act. Pl.'s Opp'n 5. Rather, Royer argues that the records at issue here are "separate and distinct from the ICRS," *id.* (quoting Compl. ¶ 36), and suggests that they are part of the Counter Terrorism Unit's (CTU) electronic database. He asserts that the CTU is a headquarters-level entity, that it "maintains all of the information it collects in a

---

[8] Royer concedes that he previously had ties to LET, an organization later classified as an FTO. The Court does not decide whether this link should qualify Royer as a "terrorist inmate." However, if the Privacy Act applies, his association with LET is irrelevant. The issue is whether BOP erroneously links him to Al Qaeda.

database of electronic records" maintained in Martinsburg, West Virginia and that its database is a separate "system of records." *Id.* at 7 (citing Tufte Decl. ¶ 11).[9]

The Court need not and cannot resolve here whether the relevant records are housed in the CTU database, whether that database constitutes a system of records, and whether that system is separate from the ICRS. BOP makes no argument regarding whether the CTU database is a system of records or is separate from ICRS. At this stage, the parties seem to dispute where the relevant information is housed and therefore whether it is exempt from Privacy Act provisions. Summary judgment is thus premature. The Court denies BOP's motion without prejudice to refile.

### B. Motion to Dismiss Constitutional Claims for Lack of Subject Matter Jurisdiction

Because a lack of jurisdiction over Royer's constitutional claims would require the Court to dismiss them, the Court first considers whether it has subject matter jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998); *Bell v. Hood*, 327 U.S. 678 (1946). The party asserting the existence of subject matter jurisdiction bears the burden of proof. *Thomson v. Gaskill*, 315 U.S. 442 (1942); *Walker v. Jones*, 733 F.2d 923, 934 (D.C. Cir. 1984). Although in deciding a motion to dismiss, all uncontroverted facts in the complaint are to be accepted as true, when determining subject matter jurisdiction, a court is not limited to considering the allegations of the complaint but has broad discretion to consider extra-pleading materials. *Land v. Dollar*, 330 U.S. 731, 735 n.4 (1947); *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003).

---

[9] In support, he notes that when he requested all records located in the ICRS that referenced his name in connection with Abu Zubair, the BOP Regional Counsel responded that "no records pertaining to your request, other than your PSR, could be located." *See* Pl.'s Mem. 8 (citing Ex. 25–26). Based on this, he deduces that BOP records suggesting that he was associated with Abu Zubair and that Abu Zubair was a terrorist organization must be located in a system of records other than the ICRS.

Royer asserts that the Court has federal question jurisdiction under 28 U.S.C. § 1331, which provides for original jurisdiction over all civil actions "arising under the Constitution, laws, or treaties of the U.S." Compl. ¶ 5. Despite the fact that Royer's claims clearly arise under the constitution, BOP argues that they are precluded by sovereign immunity.[10]

Sovereign immunity is a jurisdictional issue and thus may be raised in a 12(b)(1) motion to dismiss, a 12(c) motion for judgment on the pleadings, or later in litigation. Pursuant to the doctrine, "[i]t is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). A statutory waiver of federal sovereign immunity must be unequivocally expressed, *see, e.g.*, *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33–34, 37 (1992), and will not be implied, *Lane v. Pena*, 518 U.S. 187, 192 (1996).

The Administrative Procedure Act ("APA") waives the sovereign immunity of the United States for non-monetary claims against federal agencies. 5 U.S.C. § 702. Specifically, Section 702 provides that "[a]n action in a court of the United States seeking relief other than money damages . . . shall not be dismissed nor relief therein be denied on the ground that it is against the United States." This section applies "except to the extent that (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701. Section 702 itself also includes a caveat that "[n]othing herein . . . confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."

---

[10] BOP argues that Counts X and XI cannot be brought as "constitutional tort claims" under the rationale of *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (holding that plaintiffs may sue federal officials in their individual capacities for *damages* for Fourth Amendment violations, even without a statutory cause of action like that provided under 42 U.S.C. § 1983). However, although Royer initially characterized his claims as *Bivens* claims, they are in fact for equitable, not monetary relief. It has been over a year since Royer clarified that he did not intend to characterize these as *Bivens* claims and the Court granted his motion to strike those paragraphs of his complaint. Pl.'s Opp'n 41; Mot. to Strike Paragraphs 149 & 152, ECF No. 63 (granted by Minute Order, Apr. 4, 2011). Thus, the Court need not address BOP's *Bivens* arguments.

5 U.S.C. § 702; *see also Fornaro v. James*, 416 F.3d 63, 66 (D.C. Cir. 2005) (quoting *Transohio Savings Bank v. OTS*, 967 F.2d 598, 607 (D.C. Cir. 1993)) (noting that Section 702 excludes from the APA waiver of sovereign immunity any claims "'expressly or impliedly forbidden by another statute'").  Although Section 702 is codified in the APA, it is not limited to suits under the APA.  *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996).

Royer argues that Section 702 gives the Court authority to hear his constitutional claims.  BOP disagrees, arguing that 18 U.S.C. § 3625 precludes judicial review of decisions regarding the imprisonment of a convicted person and designation of the place of imprisonment under 18 U.S.C § 3621.  Def.'s Mem. 18 (citing 18 U.S.C. § 3625).

To resolve this dispute, the Court starts from the "strong presumption" that agency action is reviewable.  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971); *Abbott Labs. v. Gardner*, 387 U.S. 136, 140 (1967).  Pre-APA cases emphasized that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress."  *Abbott Labs.*, 387 U.S. at 140.  This was "reinforced by the enactment of the [APA], which embodies" a similar basic presumption.  *Id.*  The Supreme Court has held that "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review."  *Abbott Labs.*, 387 U.S. at 141 (quoting *Rusk v. Cort*, 369 U.S. 367, 379–80 (1962)).  Such clear and convincing evidence may include "specific [statutory] language or specific legislative history that is a reliable indicator of congressional intent," *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984), as well as "the nature of the administrative action involved."  *Id.* at 345.

BOP argues that 18 U.S.C. § 3625 provides a statutory exception to the APA waiver of sovereign immunity.  Section 3625 provides that the APA sovereign immunity waiver "do[es] not apply to the making of any determination, decision, or order" under 18 U.S.C. §§ 3621–3626.  BOP argues that it made its determination regarding Royer's conditions of confinement pursuant to 18 USC § 3621, which provides that BOP "shall designate the place of the prisoner's imprisonment."  Thus, BOP argues, review of Royer's constitutional claims is precluded.  Def.'s Mem. 18.

There are several problems with BOP's argument.  As an initial matter, it is not entirely clear that BOP's categorization of plaintiff as a "terrorist inmate" was made pursuant to 18 U.S.C. § 3621.  First, this section requires BOP to designate the "place" of an inmate's imprisonment, not the conditions of confinement within any given facility.  Moreover, Royer argues, and BOP elsewhere admits, that the decision to classify him as a "terrorist inmate" was made at least in part pursuant to 18 U.S.C. § 4081 ("Classification and treatment of prisoners"). *See* Def.'s Mem. 21–22.  The provision negating the APA waiver of sovereign immunity applies only to decisions made under 18 U.S.C §§ 3621–3626, and thus, by its terms, not to decisions made under § 4081.  Perhaps BOP's decision was made pursuant to both of these statutory provisions and perhaps judicial review of a decision made pursuant to both provisions could be precluded.  The Court need not resolve this question because BOP's argument fails for other reasons.

Even assuming that BOP's decision was made under 18 U.S.C. § 3621, the Court is not reviewing the merits of BOP's decision as to *where* Royer is housed, but the constitutionality of the conditions of confinement it places on him regardless of where he is housed.  Colorable constitutional claims are precluded from judicial review only where this has been made explicit

by Congress.  Here, Congress has precluded review of BOP "determination[s], decision[s], or order[s]" as to a prisoner's place of imprisonment.  However, Congress has not explicitly precluded review of *constitutional* claims based on these or similar decisions.

The Supreme Court decided a similar issue in *Webster v. Doe*, 486 U.S. 592 (1988).  There, the Court held that § 102(c) of the National Security Act precluded judicial review of the Director's employment termination decisions.  *Webster*, 486 U.S. at 601.  However, the Court held that the National Security Act did not preclude judicial review of constitutional challenges based on those same termination decisions.  *Id.* at 603–04 ("[The APA] remove[s] from judicial review only those determinations specifically identified by Congress or 'committed to agency discretion by law.'  Nothing in § 102(c) persuades us that Congress meant to preclude consideration of colorable constitutional claims arising out of the actions of the Director pursuant to that section . . . .").  The Court noted:

> We emphasized in *Johnson v. Robison*, 415 U.S. 361 (1974), that where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear. . . .  We require this heightened showing in part to avoid the "serious constitutional question" that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim.

*Id.* at 603 (internal citations omitted).  Thus, although 18 U.S.C. § 3625 may preclude judicial review of prison officials' decisions regarding *where* a particular prisoner is housed, it does not preclude review of constitutional challenges arising out of those decisions.[11]

---

[11] Royer argues that sovereign immunity does not bar his claims even in the absence of a § 702 waiver.  Specifically, he argues that where Congress has not clearly precluded judicial review of constitutional claims, there is a presumed right of equitable relief for constitutional violations.  As Justice Harlan noted in his concurring opinion in *Bivens*, there is a "presumed availability of federal equitable relief" to enforce the Constitution.  403 U.S. at 400 (Harlan, J., concurring).  Similarly, the D.C. Circuit noted in *Schnapper v. Foley* that "[w]e may also doubt whether, even in the absence of section 702, the *Larson* case would prevent a court from awarding equitable relief on the basis of appellants' constitutional claims.  The *Larson* Court was at some pains to note that injunctive relief against the sovereign could be obtained when *the United States* or an officer was found to have violated the Constitution . . . ."  667 F.2d 102, 108 n.2 (D.C. Cir. 1981) (emphasis added).  Finally, our Circuit has noted that "[t]he court's power to enjoin unconstitutional acts by the government . . . is inherent in the Constitution itself."  *Hubbard v. U.S. EPA Adm'r*, 809 F.2d 1, 11 n.15 (D.C. Cir. 1986) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)).  This Court need not decide the question because it finds that it has subject matter jurisdiction based on the § 702

### C.       Motion to Dismiss for Failure to State a Claim

BOP moves to dismiss both of Royer's constitutional claims, arguing that he has failed to state a claim.[12]  While, procedurally, the standard for the plaintiff's pleading requirements at the motion to dismiss stage are the same for either the Procedural Due Process or First Amendment claims, the substantive standards for what must be pled differ, as discussed in more detail below.

The Federal Rules of Civil Procedure Rule require "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Rule 8 does not require "'detailed factual allegations,'" but requires more than "'labels and conclusions'" or "'naked assertion[s].'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" meaning it must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  Factual allegations, although assumed to be true, must still "be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  The Court need not accept legal conclusions cast as factual allegations.  *Iqbal*, 556 U.S. at 678.

With respect to *pro se* plaintiffs, a complaint is "'to be liberally construed' and 'a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal

---

waiver of sovereign immunity.  However, even assuming the Court were wrong on its jurisdictional holding, the plaintiff could re-file his complaint to take advantage of the officer suit fiction.  Our Circuit has recently reaffirmed the availability of officer suits for allegedly unconstitutional federal actions.  *See Pollack v. Hogan*, 2012 WL 6216433, *2 (D.C. Cir. Dec. 14, 2012) ("[U]under the so-called *Larson–Dugan* exception to the general rule [of sovereign immunity] . . . 'suits for specific relief against officers of the sovereign' allegedly acting . . . 'unconstitutionally' are not barred by sovereign immunity.").

[12] Both BOP and Royer have introduced materials beyond the pleadings.  Thus the motion could be treated as a motion for summary judgment and the merits reached.  However, to convert a motion to dismiss to a motion for summary judgment the parties should be given a reasonable opportunity to present all material relevant to the motion.  The Court will not convert the motion and will only consider the extra-pleading materials with respect to the summary judgment motion and not the motion to dismiss.

pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)); *cf.* Fed. R. Civ. P. 8(f) ("All pleadings shall be so construed as to do substantial justice").

"[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates.  Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84 (1987) (citing *Procunier v. Martinez*, 416 U.S. 396, 405 (1974)).  However, courts should also realize that they are "ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Procunier*, 416 U.S. at 405. As the Supreme Court noted in *Procunier*, "the problems of prisons in America are complex . . . and not readily susceptible of resolution by decree." *Id.* at 404–05.  "Prison administration is, moreover, a task that has been committed to the responsibility of [the legislative and executive] branches, and separation of powers concerns counsel a policy of judicial restraint." *Turner*, 482 U.S. at 84–85.

Given the competing considerations at play in prisoners' rights cases, the Supreme Court in *Turner* formulated a test to evaluate the constitutional claims of prisoners that is intended to be "responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.'"  482 U.S. at 85.  There, the Supreme Court held that four factors are relevant to whether a prison regulation affecting a constitutional right surviving incarceration withstands constitutional challenge:

> whether the regulation has a 'valid, rational connection' to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are 'ready alternatives' to the regulation.

*Overton v. Bazetta*, 539 U.S. 126, 132 (2003) (quoting *Turner*, 482 U.S. at 89–91)).

### 1.    Royer Has Failed to State a First Amendment Claim

Royer invokes the First Amendment to challenge restrictions on his contacts and communications with his family.  Royer argues that his freedom of speech and association have been infringed, though his claim seems ultimately to be a freedom of association claim.

Specifically, Royer points out that, in contrast to the forty hours of full contact visits per month enjoyed by general population inmates, Compl. ¶ 80, BOP has limited him to two, two-hour noncontact visits per month.  If his family visits, he must talk with them through a telephone, separated by a wall of concrete, glass, and bars.  Compl. ¶ 107.  Royer also notes that while inmates in the general population enjoy 300 minutes of telephone time per week, he has been limited to one 15-minute call per week and may only place it on business days between 8:30am and 2:30pm.  As a result, he has been effectively precluded from speaking with his school-age children for months at a time.  Compl. ¶ 96.  Finally, Royer points to the "total, permanent" nature of the ban on physical contact with his family as evidence of the lack of a rational relationship between BOP's goals and its policy.

According to Royer's complaint, BOP has imposed these limitations because they need to monitor his communications.  However, Royer argues that the limits do not bear a rational relation to a legitimate government interest, or that the limits are an exaggerated response to any such interest.  Compl. ¶ 151.  BOP responds that inmates do "not retain rights inconsistent with proper incarceration," Def.'s Mem. 22, and that "freedom of association is among the rights least compatible with incarceration," *id.* at 23.  Again, BOP argues that prison administrators must be able to exercise their judgment as to the appropriate means of furthering penological goals.  *Id.*

The Supreme Court has acknowledged that "the Constitution protects 'certain kinds of highly personal relationships.'"  *Overton*, 539 U.S. at 131 (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984)).  "[O]utside the prison context, there is some discussion in

[Supreme Court] cases of a right to maintain certain familial relationships, including association among members of an immediate family and association between grandchildren and grandparents." *Id.* (citing *Moore v. East Cleveland*, 431 U.S. 494 (1977) (plurality opinion); *Meyer v. Nebraska*, 262 U.S. 390 (1923)).

However, the Court has also stated that "freedom of association is among the rights least compatible with incarceration . . . .   Some curtailment of that freedom must be expected in the prison context." *Overton*, 539 U.S. at 131 (citing *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125–26 (1977); *Hewitt v. Helms*, 459 U.S. 460 (1983)).   In *Jones*, the Court stated:

> First Amendment associational rights . . . must give way to the reasonable considerations of penal management. . . .   [N]umerous associational rights are necessarily curtailed by the realities of confinement.   They may be curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably conclude that such associations, whether through group meetings or otherwise, possess the likelihood of disruption to prison order or stability, or otherwise interfere with the legitimate penological objectives of the prison environment.

433 U.S. at 132.

In fact, the Supreme Court, applying the *Turner* reasonableness test, appears to have already upheld regulations substantially similar to those Royer challenges.   In *Overton*, the Court reversed a Sixth Circuit decision which had invalidated Michigan prison regulations pertaining to noncontact visits.   539 U.S. at 131, 137.   In addition to limiting the highest security risk inmates to noncontact visits, the regulations limited the number of total visitors an inmate could receive and restricted child visitors.   *Id.* at 129–30.   The regulations also provided that an inmate who had committed multiple substance abuse violations while in jail could not receive any visitors other than attorneys or clergy members for a minimum of two years.   *Id.* at 130.   Although the Court did not discuss at length the impact that a prohibition on physical contact has on inmates

and their families, the Court found that the regulations met the *Turner* standard in that the regulation had a valid, rational connection to a legitimate government interest, alternative means were available to inmates to exercise the asserted right, accommodating the right would cause a significant reallocation of resources and would impair the prison's ability to protect all individuals inside the prison walls, and no ready alternatives undermined the reasonableness of the regulations. *Id.* at 132–36.

Although *Overton* thus appears directly on point, the Court now applies the *Turner* factors to determine whether the federal practice challenged here is reasonable.

Applying the first *Turner* factor, there certainly appears to be a valid, rational connection between the rules applied to so-called "terrorist inmates" and a legitimate government interest.[13] The Supreme Court in *Block v. Rutherford*, 468 U.S. 576 (1984), noted many of the security challenges posed by contact visits:

> Contact visits invite a host of security problems. They open the institution to the introduction of drugs, weapons, and other contraband. Visitors can easily conceal guns, knives, drugs, or other contraband in countless ways and pass them to an inmate unnoticed by even the most vigilant observers. And these items can readily be slipped from the clothing of an innocent child, or transferred by other visitors permitted close contact with inmates.

*Id.* at 586.

Here, Royer concedes that at least one basis for BOP's practice is the interest in monitoring his communications. Compl. ¶ 109. In his Opposition to the Motion to Dismiss, he concedes that "monitoring inmates' communication is, in the abstract, a legitimate penological

---

[13] The Court assumes, for the sake of this First Amendment analysis, the legality of the government's "terrorist inmate" classification scheme and the accuracy of Royer's classification. Royer separately challenges the government's failure to engage in notice-and-comment rulemaking prior to implementing this scheme. Royer also separately challenges, as discussed in more detail below, whether the scheme complies with procedural due process requirements. The question before the Court with respect to Royer's First Amendment challenge is whether, assuming the legality of the BOP's classification of him as a "terrorist inmate," the resulting conditions of his confinement violate his First Amendment rights.

goal" though he contests the legitimacy of monitoring him to a greater extent than other inmates. Pl.'s Opp'n 56.  In his complaint, he also quotes BOP regulations which state that control units such as the CMUs are "intended to place into a separate unit those inmates who are unable to function in a less restrictive environment without being a threat to others or to the orderly operation of the institution."   Additionally, although he notes that the majority of the inmates subject to the same conditions are Muslims (40 of the 60 current or former CMU Terre Haute inmates according to his complaint), he does not assert that BOP has implemented these regulations in bad faith or for the purpose of discriminating against a particular religious group. *See* Compl. ¶ 92.  Thus, there appear to be at least two legitimate government interests at stake: the need to monitor inmate communications and the need to isolate inmates that might pose a threat to others or to the orderly operation of the institution.

Royer argues BOP has failed to put forward the "legitimate government interest" it seeks to further and that thus, it would be inappropriate to evaluate this factor or to decide the larger question on a motion to dismiss.  Indeed, Royer is correct that BOP's only justification for its practice appears to be that "prison administrators must be able to reasonably exercise their judgment as to the appropriate means of furthering penological goals."   Nevertheless, the Supreme Court has said that the "burden . . . is not on the [government] to prove the validity of prison regulations but on the prisoner to disprove it."   *Overton*, 539 U.S. at 132 (citing *Jones*, 433 U.S. at 128).  This is particularly the case at the pleading stage where Royer must present facts that plausibly state a claim.  Given the state of the caselaw regarding prisoners' first amendment and visitation rights, Royer has not plausibly alleged here that there is no legitimate government interest at stake, and in fact, has conceded that there is at least one legitimate government interest.  Thus, the Court now turns to the remainder of the *Turner* factors.

The second *Turner* factor considers "whether alternative means are open to inmates to exercise the asserted right."  Here, Royer acknowledges that, although he is prohibited from having contact visits with his family, he still retains the right to have noncontact visits, to make phone calls during business hours, and to write letters.  Nevertheless, he argues that "there is no substitute for physical contact with loved ones" and that his wife would not have divorced him if BOP had not prohibited contact visits.  Compl. ¶¶ 80, 117.  He also asserts that phone calls are not a viable alternative for speaking with his children because the calls are limited to business hours when the children are typically in school.  Thus, he states, the "'alternatives' are so restrictive . . . that they are rendered inadequate."  Pl.'s Opp'n 61.

However, although the Court must accept the facts asserted as true, it need not accept Royer's legal conclusions as to what constitutes "alternative means".  The Supreme Court has identified alternative means of associating to include sending letters, making phone calls, and even sending messages through others who are allowed to visit.  *Overton*, 539 U.S. at 135.  "Alternatives to visitation need not be ideal . . . they need only be available."  *Id.*  Thus, Royer has failed to plausibly allege that no alternatives exist.

The third *Turner* consideration is the impact that accommodation of the asserted right would have on guards, other inmates, and prison resources.  On this point, Royer merely asserts that there would be no "ripple effect" from accommodating his demands and that such accommodation would by "eas[y] and simpl[e]."  Pl.'s Opp'n 62.  However, Royer provides no facts to support this assertion.  The Court assumes that prison officials, in order to effectively monitor Royer's communications during these visits, would need to institute more stringent search procedures of Royer and his visitors prior to each visit and would need to have more staff on hand to monitor the interactions between Royer and his visitors.

24

Finally, the Court considers whether there are "ready alternatives" which undermine the reasonableness of the regulations.  On this point, Royer argues that BOP could meet its goal of monitoring his visits at "no extra cost or risk to other inmates," Pl.'s Opp'n 63, because BOP has already "installed multiple cameras and hypersensitive microphones . . . [a]nd its officers thoroughly and expertly strip search all inmates both before and after contact visits."  Compl. ¶ 111.  However, the Supreme Court has emphasized that the inquiry regarding this factor is not whether prisons have imposed the *least restrictive* regulation but "whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal."  *Overton*, 539 U.S. at 136.  Increasing the number of inmates who must be strip searched before and after each contact visit would surely increase the cost of visitation and divert attention from other priorities.  Moreover, although Royer asserts that BOP has cameras and "hypersensitive" microphones, it is not self-evident that this would obviate all security concerns that might arise from contact visits, such as the covert passing of notes, hand signals, or whispered conversations.  As a result, Royer has not sufficiently pled this factor either.

In summary, the Court has little trouble concluding that the restrictions on contact visits and phone calls survive Royer's First Amendment freedom of association challenge.  A more difficult question is whether the alleged permanence of the restrictions raises additional concerns.  For example, in *Overton*, although the Court upheld a two-year ban on visitation from anyone other than clergy members and attorneys, the Court noted that it might reach a different conclusion regarding a "*de facto* permanent ban on all visitation for certain inmates."  539 U.S. at 134; *see also Beard v. Banks*, 548 U.S. 521, 535 (2006) ("[A]s in *Overton*, we agree that 'the restriction [denying newspapers, magazines, and photographs to specially dangerous and

recalcitrant inmates] is severe,' and 'if faced with evidence that [it were] a *de facto* permanent ban . . . we might reach a different conclusion in a challenge to a particular application of the regulation.'").

However, even though Royer's complaint alleges that the restrictions applicable to him are to last for the duration of his incarceration, they do not involve a *complete* ban on visitation or communication, but rather a ban on *contact* visits and a limit on the number of visit and phone calls and time of day.   Moreover, the Court in *Overton* upheld regulations that appeared to impose an indefinite ban on contact visits for inmates classified as the highest security risks.  *Id.* at 130.  Finally, other courts have stated that "there is no inherent, absolute constitutional right to contact visits with prisoners," *Bazzetta v. McGinnis*, 124 F.3d 774, 779 (6th Cir. 1997), *supplemented* 133 F.3d 382 (6th Cir. 1998), and our Circuit has even upheld a permanent ban on all visitation between an incarcerated man and his wife, *Robinson v. Palmer*, 841 F.2d 1151, 1156 (D.C. Cir. 1988) (holding that permanent ban on visitation between spouses after wife was caught attempting to smuggle marijuana into prison reasonably furthered legitimate government objective).[14]

Thus, the Court finds that the restrictions on Royer's communication and interaction with his family, despite appearing to be indefinite, satisfy the requirements of the First Amendment and the test the Supreme Court has set forth for inmates' constitutional challenges.

### 2.   *Procedural Due Process Claim*

The Fifth Amendment provides that no person shall be "deprived of life, liberty or property, without due process of law."  U.S. Const. amend. V.  "The touchstone of due process is

---

[14] Bans on contact visits have also been upheld under the Due Process clauses.  In *Block v. Rutherford*, the Supreme Court upheld, under the Fourteenth Amendment, a ban on noncontact visits for pre-trial detainees.  468 U.S. 576, 588 (1984) (concluding the ban was a reasonable, nonpunitive response to legitimate security concerns).  In *Aref v. Holder*, Judge Urbina of this court dismissed Substantive Due Process claims by other "terrorist inmates" that the same restrictions at issue here violated their First Amendment right to "family integrity."  774 F. Supp. at 162–63.

protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) (citing *Dent v. West Virginia*, 129 U.S. 114, 123 (1889)).

The due process clause has both substantive and procedural aspects and only procedural due process appears to be at issue here.[15] "Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (internal quotation marks omitted). Thus, to state a procedural due process claim, a plaintiff must plead that a life, liberty, or property interest was at stake, that government action resulted in a deprivation or infringement of that interest, and that the plaintiff did not receive the process he was due.

As with other prisoners' rights cases, unique concerns arise in the context of prisoners' due process claims because a prisoner has already been deprived of much of his liberty through the process of criminal conviction and incarceration. However, prisoners are "not wholly stripped of constitutional protections" upon conviction and retain Due Process protections against arbitrary deprivations of liberty. *Hatch v. Dist. of Columbia*, 184 F.3d 846, 849 (D.C. Cir. 1999) (citing *Wolff v. McDonnell*, 418 U.S. 539, 555 (1974)).

---

[15] The Supreme Court's substantive due process cases interpret the Fifth and Fourteenth Amendments' guarantee of due process to forbid the government from infringing "certain 'fundamental' liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 301–02 (1993) (citations omitted). The Supreme Court has considered some substantive due process claims to prison regulations. *See, e.g., Washington v. Harper*, 494 U.S. 210 (1990) (holding that treatment of prisoner against his will with antipsychotic drugs did not violate substantive due process if the prisoner was dangerous to himself or others and treatment was in his interest). In so doing, the Court utilized the *Turner* test to evaluate the constitutionality of the regulations at issue. *See also Aref v. Holder*, 774 F. Supp. 2d 147, 162–63 (D.D.C. 2011) (applying *Turner* test to determine whether the plaintiffs' had sufficiently alleged their substantive due process claim). However, the appropriate test for *procedural* due process challenges is not the *Turner* test, but the more typical procedural due process inquiry of whether the government has deprived plaintiff of a liberty interest without adequate process. *See Harper*, 494 U.S. at 228; *see also Aref*, 774 F. Supp. 2d at 163–67.

### a.      Royer Has Sufficiently Alleged a Liberty Interest

Some liberty interests flow from the Due Process Clause itself.  *See Washington v. Harper*, 494 U.S. 210, 221–22 (1990) (recognizing that a prisoner has a "significant liberty interest in avoiding unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment").  Other liberty interests may be created by state or federal laws or practices regulating the terms or conditions of a prisoner's confinement.  *See Sandin v. Conner*, 515 U.S. 472, 483–84; *Wilkinson*, 545 U.S. at 221.  Royer asserts that his liberty interest flows from the latter source.  Compl. ¶¶ 2, 86–87, 148.

In *Sandin v. Conner*, the Supreme Court considered whether an inmate's placement in disciplinary segregation for 30 days implicated a state-created liberty interest.  515 U.S. 472. The Court held that it did not, finding that the conditions substantially mirrored those in similar, discretionary confinement such as administrative segregation.  *Id.* at 486–87.  In summarizing its holding, the Court noted that state-created liberty interests "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Id.* at 484.

However, the Supreme Court has not yet defined what constitutes the "ordinary incidents of prison life" or, in other words, against what baseline courts should evaluate conditions of confinement to determine whether they are atypical and significant.  *See Wilkinson*, 545 U.S. at 223 (describing the lack of agreement among the Courts of Appeals on the issue as well). Nevertheless, the D.C. Circuit has considered the question and this Court relies on its analysis.

In *Hatch v. Dist. of Columbia*, the D.C. Circuit considered whether placement of an inmate in disciplinary and administrative segregation for seven months implicated Due Process.

184 F.3d 846.  During these seven months, the plaintiff was "[c]onfined to his cell for twenty-three and a half hours per day on weekdays and all forty-eight hours on weekend[s]," "had no outdoor recreation," and "was not allowed to work or visit the library, gym, health clinic, psychological services, mailroom, clothing and bedding exchange, or culinary unit." *Id.* at 848. He was denied access to legal phone calls for ninety days. *Id.* The circuit court reversed the district court's grant of summary judgment for the government and remanded for further fact-finding.  The court concluded that the "ordinary incidents of prison life" should be evaluated in relation to the "most restrictive confinement conditions that prison officials, exercising their administrative authority to ensure institutional safety and good order, routinely impose on inmates serving similar sentences." *Id.* at 856.  The analysis requires a "factual determination of the most restrictive conditions prison officials '*ordinarily*' or '*routinely*' impose" on prisoners serving similar sentences.[16] *Id.* at 857 (emphasis added).[17]

In *Hatch*, the Circuit concluded that administrative segregation was an "ordinary incident" of life at the prison and should thus be included as part of the baseline for determining whether the segregative confinement implicated a constitutionally protected liberty interest. *Id.* at 856.

However, the court noted, in addition to considering the nature of the deprivation in relation to this baseline, that courts must also consider the length of the deprivation and whether the segregation was within the range of what would be expected in light of the length of the sentence the prisoner is serving. *Id.*  Because the possibility of transfer to another prison is one

---

[16] The Circuit did not explicitly define what constitutes a "similar sentences" but did emphasize the need for courts to consider the *length* of the sentence.

[17] While *Sandin* and *Hatch* dealt with Fourteenth Amendment Due Process claims and state prisons, there appears no reason why the analysis should not apply to Fifth Amendment Due Process claims and federal prisons.  Indeed, other circuits have applied *Sandin* to due process claims against federal officials.  *See, e.g., Magluta v. Samples*, 375 F.3d 1269 (11th Cir. 2004); *Jordan v. Fed. Bureau of Prisons*, 191 Fed. Appx. 639 (10th Cir. 2006) (unpublished).

of the ordinary incidents of prison life, the baseline need not be limited to conditions at the particular prison in which the inmate is confined.  However, neither need it be so broad as to consider conditions in any prison nationwide, including those "especially restrictive" prisons where "all inmates are locked down almost the entire day."  *Id.* at 856–57.

BOP disputes Royer's argument that his classification imposes an "atypical and significant hardship" and that it is outside what a prisoner may "reasonably expect to encounter as a result of his or her conviction in accordance with due process."  Def.'s Mem. 19.

Royer suggests that the required fact-specific inquiry is not possible or appropriate at the motion to dismiss stage.  Pl.'s Opp'n 36.  The Court agrees that at this stage, it need not determine whether Royer's conditions of confinement actually *are* harsh and atypical in comparison with administrative segregation and other conditions ordinarily and routinely imposed.  Rather, the Court need only determine whether the complaint contains sufficient factual matter, accepted as true, to *plausibly state a claim* that the conditions are harsh and atypical and thus implicate a liberty interest.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679; *see also Marion v. Columbia Correction Inst.*, 559 F.3d 693, 699 (7th Cir. 2009) (reversing the dismissal of a prisoner's due process claim because, without a factual record, the court could not determine whether the actual conditions of the plaintiff's confinement resulted in the implication of a liberty interest).

The Court holds that Royer has plausibly alleged harsh and atypical conditions.  First, as detailed above, Royer's complaint alleges that he has been segregated from the general population for over six years and that during this time he has been subject to restrictions on the

recreational, religious, and educational opportunities normally available to prison inmates. Royer's contacts with his family have been limited to one 15-minute phone call per week during business hours, when his school-age children are in school.  Finally, he is limited to two, two-hour noncontact visits per month.  It is true that Royer's complaint does not specifically outline the "most restrictive confinement conditions that prison officials, exercising their administrative authority to ensure institutional safety and good order, routinely impose on inmates serving similar sentences."  However, Royer did note that while in the SHU at FCI Greenville, he was "isolated to a greater extent than is typical for the SHU," that he was not allowed to exercise in the recreation cages at the same time as other SHU inmates, that staff placed sandbags in front of his cell door, and that unlike other SHU inmates, he was not permitted to have contact visits. Compl. ¶ 101.  He also asserted that BOP had permanently imposed upon designated "terrorist inmates" the "harshest conditions of confinement in the federal prison system."  Compl. ¶ 106.

Even assuming that the conditions alleged by Royer are no more restrictive than the most restrictive conditions normally imposed, for example in administrative segregation, Royer's complaint plausibly alleges that they are "harsh and atypical" because of their duration.   In numerous parts of his complaint, he alleges that the conditions are permanent and are intended to remain in place for the duration of his 20-year sentence, or for a total of about 16.5 years.  *See Wilkinson*, 545 U.S. at 224  (noting that conditions in a supermax facility "likely would apply to most solitary confinement" but that unlike solitary confinement generally, placement in a supermax facility is indefinite, and relying on this in part to find that conditions were "harsh and atypical").[18]

---

[18] Judge Urbina also found that the conditions to which "terrorist inmates" are subject plausibly could "constitute an atypical and significant hardship" although he appears to have used conditions in the general population as the baseline for comparison. *See Aref*, 774 F. Supp. 2d at 165–66.

BOP launches several additional arguments in support of its motion to dismiss that the Court does not find persuasive. First, it argues that the Attorney General has discretion to "designate the institution of an inmate's confinement." Def.'s Mem. 19. While this is true, *see Meachum v. Fano*, 427 U.S. 215, 225 (1976) (confinement in another State is "within the normal limits or range of custody which the conviction has authorized the State to impose"); *Olim v. Wakinekona*, 461 U.S. 238, 247 (1983) ("[I]t is neither unreasonable nor unusual for an inmate to serve practically his entire sentence in a State other than the one in which he was convicted and sentenced . . . ."), Royer does not challenge the *location* of his confinement. Instead he argues that the "the atypical conditions of confinement are applied to [him] regardless of" where he is confined. Compl. ¶ 86. Next, BOP argues that its regulations concerning classification, designation, and transfer do not limit its discretion so as to create a legitimate expectation that a prisoner will be assigned to a particular facility. Def.'s Mem. 20. However, this is no longer the appropriate inquiry for determining whether a prisoner has liberty interest. The Supreme Court in *Sandin* "abandon[ed] the approach" to prisoner due process claims of "search[ing] for a negative implication from mandatory language in prisoner regulations." 515 U.S. at 483 & n.5. Instead the Court adopted the "atypical and significant hardship" test discussed above.

Thus, the Court believes that Royer has stated a plausible claim that his classification as a "terrorist inmate" and the associated, indefinite conditions of confinement, are harsh and atypical and thus implicate a liberty interest.

### b.      Royer Has Sufficiently Alleged Denial of Process Due

Due process requirements are "flexible and call[] for such procedural protections as the particular situation demands . . . ." *Wilkinson*, 545 U.S. at 224 (internal quotation marks

omitted).  Thus, in determining what process is due, courts rely not on rigid rules, but on the

framework articulated in *Mathews v. Eldridge*.  Under *Mathews*, courts consider three factors:

> First, the private interest that will be affected by the official action; second, the
> risk of an erroneous deprivation of such interest through the procedures used, and
> the probable value, if any, of additional or substitute procedural safeguards; and
> finally, the Government's interest, including the function involved and the fiscal
> and administrative burdens that the additional or substitute procedural
> requirement would entail.

424 U.S. at 335.

The first *Mathews* factor, the private interest at stake, is to be evaluated "within the

context of the prison system and its attendant curtailment of liberties."  *Wilkinson*, 545 U.S. at

225.  "[T]he procedural protections to which [prisoners] are entitled are more limited than in

cases where the right at stake is the right to be free from confinement at all."  *Id.*  The second

factor looks to the risk of erroneous deprivation through the procedures used and the value of any

additional safeguards.  The Supreme Court has stated that notice of the factual basis for the

government's decision and a "fair opportunity for rebuttal" are "among the most important

procedural mechanisms for purposes of avoiding erroneous deprivations."  *Id.* at 226.  The third

factor, the government's interest and burden of additional procedures, is a "dominant

consideration" in the context of prison management.  *Id.* at 227.  The government must ensure

the safety of guards and other prison personnel, other inmates, and the public.  It must be able to

prevent prison violence.  In the case of inmates who purportedly have links to terrorist

organizations, the danger to the public is all the greater.  Finally, the simple issue of time and

money and the resources necessary to put in place additional procedures are relevant.

*Hewitt v. Helms* specifies the minimum procedures for placing an inmate in segregative

conditions if he has a liberty interest in avoiding such segregation.  *See Hatch*, 184 F.3d at 852

(describing *Hewitt*'s minimum procedures).  Those procedures include "some notice of the

charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Hewitt* 459 U.S. at 476. "Although a hearing need not occur prior to confinement in administrative segregation, it 'must occur within a reasonable time following an inmate's transfer.'" *Hatch*, 184 F.3d at 852 (quoting *Hewitt*, 459 U.S. at 476 n.8.

The Court need not linger over the balance of these factors and the exact process required because the complaint plausibly alleges that any process provided by BOP was inadequate. Royer alleges that he was taken from his cell "without warning" and only provided with an "Administrative Detention Order" stating that he was being moved to the SHU because he was "pending classification." Compl. ¶ 88. Royer was apparently told at some point (or learned) that he had been classified as a "terrorist inmate," Compl. ¶¶ 81, 101, though it is unclear when or how this occurred. Royer states that he was never provided with a hearing, with notice of the criteria for release from the conditions, or with notice of the projected date for release from those conditions. Compl. ¶ 105.

Given these allegations, it is unclear that the prison ever directly provided him with notice of the reasons for his segregation and it appears that he has had no opportunity for a hearing. Thus, his complaint plausibly alleges that he was denied due process.

## I.     CONCLUSION

In summary, the Court DENIES WITHOUT PREJUDICE BOP's Motion for Summary Judgment regarding Royer's Privacy Act claims. The Court finds that it has subject matter jurisdiction to consider Royer's constitutional claims and thus DENIES BOP's motion to dismiss for lack of jurisdiction. With respect to those constitutional claims, the Court GRANTS BOP's

motion to dismiss the First Amendment claim for failure to state a claim and DENIES BOP's

motion to dismiss Royer's Due Process claims.

Signed by Royce C. Lamberth, Chief Judge, on March 28, 2013.